## FLORENCE M. STIBBS v. NORTHWEST AIRLINES, INC., AND ANOTHER.

152 N. W. (2d) 318.

July 14, 1967—No. 40,552.

*Peterson, Bell & Converse* and *Willard L. Converse,* for relator.
*Lasley, Foster & Roehrdanz* and *W. M. Lasley,* for respondents.

KNUTSON, CHIEF JUSTICE.

Certiorari to review a decision of the Industrial Commission denying compensation benefits to the widow of a deceased employee.

This is another in the long line of cases dealing with the causal connection of employment and death due to a heart attack.

The employee, Bernard E. Stibbs, was employed by Northwest Air-

lines, Inc., as a line mechanic. His duties were described by Julian Studer, with whom he worked. He would check and service the airplanes without actually overhauling engines, so as to keep them airworthy. His activities included checking oil filters and the oil in the engine to see if it was contaminated, changing oil when necessary, and changing other components and parts. His work did not require any heavy lifting. In the few instances when that was necessary, he had mechanical equipment to assist him.

Mr. Stibbs had a long history of heart disease. In the fall of 1960 he sought medical attention at the Mayo Clinic in Rochester and his condition was diagnosed as angina pectoris, coronary sclerosis, and calcification of the abdominal aorta. He was instructed to avoid strenuous activity such as shoveling snow, and was given a low cholesterol diet. In the fall of 1962 he again complained of pains in his chest, and on December 18, 1962, he suffered a heart attack while asleep at home. He returned to the Mayo Clinic, where his condition was diagnosed as coronary heart condition with myocardial infarction.

On March 4, 1963, he returned to work as a line mechanic after an absence of about 10 weeks due to the attack. On August 29, 1963, he reported to work at 7 a. m. There was no work for him in checking airplanes so as a temporary fill-in he and Studer were assigned the job of removing numeral decals on the side of a jet passenger plane. These decals were about 8 inches by 5 inches in size, and the job of removing them and replacing them with new decals was usually performed by a different crew, but on this day it was given to deceased and Studer in order that they would have something to do. Studer, whose testimony is relied upon by both parties, stated that the first step in removing the decals was to paint on a remover called "Turco" with a paint brush. His testimony best describes what the work consisted of. He stated that after the Turco was brushed on the decals, "Then we'd scrape this off and, of course, there would be a residue; that adhesive that's on the back of this is very sticky and it stays on there pretty much. So we would apply Turco on that then and remove as much as we could with the Turco after we had taken this outside paper off, and in most cases we would use ketone—methyl ethyl ketone, I guess it's called really—and we would

saturate a rag with that and then rub—rub on there until the adhesive came off. Sometimes it would take quite a bit of rubbing. Wouldn't necessarily have to be hard rubbing, but it was continuous rubbing in that you had to—ketone evaporates so fast that you have to keep rubbing it to keep it—the adhesive moist so that it would dissolve it." With respect to a comparison of the physical exertion required for the removal of decals with the usual work of line mechanics, he testified, "Well, I would say it was—it was more continuous. It wasn't harder work exactly, but, I mean, well, I would think if you did that all day that you would be more tired than you would be if you are just doing the regular mechanic work that we do. * * * Well, the way—if I understand your question right, I would say that the rubbing is more continuous work than what we would ordinarily do. Not heavier, but continuous. When we were removing bolts or nuts or something like that, it's a hard pull, but it wouldn't be continuous like, continuous movement."

About 9 a. m., a 10-minute coffee break was taken. They had then completed the removal and replacing of three decals on the left side of the plane, and after the coffee break, started removal of those on the right side. Studer was called off that job and started to work in another hangar. Shortly before 10 a. m. the deceased, Stibbs, was found in a prone position near the base of the ladder where he had been working; he expired some 20 minutes later. The death certificate stated the cause of death to be arteriosclerotic heart disease, and no autopsy was performed.

The question before us, as in so many of these cases, is whether death was causally related to the employment.

■ Three specialists in internal medicine testified at the hearing. Dr. Guillermo Mateo, called by relator, testified that in his opinion the work performed by Stibbs on the fateful morning was a contributing factor to his death. He indicated that a continuous output of exertion is more likely to produce a heart attack than strong exertion of short duration.

Dr. John A. Callahan, also called by relator, who had treated Stibbs at the Mayo Clinic, testified that in his opinion the work Stibbs was doing that morning constituted a causal contributing factor to his death. His opinion is also based, apparently, on the fact that a change of pace, that

is, more continuous work than he had been doing, would be apt to bring on a heart attack.

Dr. Reuben Berman, a specialist in cardiology and president of the Minnesota Heart Association, was called by the employer. He testified that in his opinion the work Stibbs was doing on the morning in question had no causal connection with the death.

The referee found that death arose out of and in the course of decedent's employment. The Industrial Commission reversed, holding that there was no causal relationship between the employment and death.

It is the contention of relator that the opinion of Dr. Berman was based on the wrong premise in that he assumed that the work was no harder than the employee had been performing in his regular work as a line mechanic. It is true that we find that statement in the opinion of Dr. Berman, if it is taken out of context. However, reading the whole hypothetical question and the whole opinion, it is evident that the essence of Dr. Berman's opinion is found in the following statement:

"From the facts laid before me it is my opinion that the death occurred from the natural course of events associated with this form of heart disease. I am unable to ascribe a causal relationship of the disease or the immediate situation preceding his death to the occupation or to his activities immediately prior to death. The work situation he was in did not require arduous activity. The surroundings were reasonably pleasant and comfortable. He was not involved in heavy work. He was not involved in work as heavy as it was his custom to do for his job. The actual work was removing a decal area as described above. I do not consider this to be excessive activity. The work involved is on a par, from the standpoint of human energy expenditure, with the effort involved of a man who is up and around doing his own bathing, shaving, personal toilet and walking. There is no evidence that the solvents used could have influenced the coronary disease."

While we have held that an expert's opinion must rest on facts in evidence or inferences which can reasonably be drawn therefrom, and that if material factual premises are invalid the conclusion must fall, Grapentin v. Harvey, 262 Minn. 222, 114 N. W. (2d) 578, the opposite is also

true; and when there is a factual basis for the inference, the conclusions drawn by the finder of fact must stand.

Here it is evident that Dr. Berman's opinion was based on the premise that the work being done by the deceased, either regularly or temporarily on the date of the onslaught of the disease, was not of such a nature that it would contribute towards his death from the heart attack. While it is no longer necessary to show that the exertion must be something extraordinary, or an accident, Golob v. Buckingham Hotel, 244 Minn. 301, 69 N. W. (2d) 636, it must be shown that the death from a heart attack is due to the work that was being done and that the employment was a contributing factor in bringing about the death. Based upon the opinion of Dr. Berman, which the commission was privileged to accept, the finding is amply sustained by the evidence. We see no necessity for further discussing the evidence.

■ The only other contention of relator is that the commission applied the wrong rule of law. The commission found that the death did not arise out of employment. In its memorandum it said:

"Is there, therefore, evidence in the record which shows that the employee's work was of such a stressful nature that his heart attack was more likely the result of his work than the natural progression of degenerative heart disease?"

This, argues relator, applies an "either-or" test; that is, either the work caused his death or the degenerative heart disease caused his death, while it is enough to show that the employment is a proximate, contributing cause of the disability or death, citing in support Gillette v. Harold, Inc. 257 Minn. 313, 101 N. W. (2d) 200.

The position of relator is untenable. What the commission held was that the employment had nothing to do with the death. While this may sound like an "either-or" test, it is the ultimate conclusion that is necessary in determining whether the death was causally related to the employment. If the employment had nothing to do with the death, surely it was not a contributing cause; and that, essentially, is the final test. By a process of dissection of the language used by the commission in its memorandum, relator attempts to create a meaning that does not exist if the memorandum is read in toto.

We are convinced that the decision of the Industrial Commission is amply supported by the evidence; that the only issue involved was a fact question; and that no erroneous legal principle was applied. Therefore, the decision must be and is affirmed.

Affirmed.