### ELIZABETH ANNIE KLEMAN v. FORD MOTOR COMPANY.

239 N. W. 2d 449.

February 13, 1976—No. 45786.

*Dorsey, Marquart, Windhorst, West & Halladay, William E. Martin,* and *Robert L. Hobbins,* for relator.

*Okerman & Susee, Lee A. Bernet III,* and *Jan Henry Susee,* for respondent.

YETKA, JUSTICE.

The relator seeks review of a decision [1] of the Workers' Compensation Board affirming the compensation judge's award of dependency benefits to respondent, widow of the deceased employee. The critical question before the board and on appeal is whether the employee's heart attack arose out of and in the course of his employment. We affirm.

The employee died at 3:10 p. m. on January 25, 1973. The cause of death was atherosclerotic heart disease with acute myocardial infarction. The employee was 52 years old when he died. He was overweight and had been treated for hypertension since the summer of 1972. In August 1972 he was treated for edema of both legs. This was considered at the compensation hearing as an indication of some degree of heart failure. He also had a borderline high serum cholesterol. The autopsy disclosed that the employee had an advanced condition of degenerative atherosclerotic heart disease.

The autopsy was performed by Dr. Frank Kapps approximately 3 hours after employee's death. Microscopic examination disclosed a very recent thrombus (blood clot) at the pinpoint lumen of the coronary artery. Dr. Kapps estimated that the thrombus formed within 24 hours of death. Microscopic examination disclosed physical change in the coronary tissue which indicated that the infarction process had begun at least 12 hours before death. Dr. Kapps testified that process most likely began about 24 to 30 hours before death, but with 48 hours as an outside maximum. He stated that the infarction could have been caused by or could have caused the thrombus. He couldn't state which with any degree of certainty.

---

[1] Three opinions were filed by the commission including a dissenting opinion of Commissioner James Pomush.

Quite a bit of testimony was presented in regard to employee's duties at work. It is apparent that some of his duties were not physically taxing while others were, such as lifting door panels and piling them to maintain inventory levels. The employee had been working mandatory overtime for several months prior to his death, including 10 hours each day of the week of his death. He had occasionally complained about the overtime.

His wife testified as to his demeanor during the week of his death. During the week he appeared tired and irritable and complained about too much walking, strenuous reaching, and stretching. On Monday evening he looked all right. On Tuesday night he complained of chest pains and stated that he had been doing heavy lifting and strenuous reaching. On Wednesday he was again tired and irritable and complained about heavy lifting. However, he slept soundly both Tuesday and Wednesday nights.

On Thursday he got up as usual to begin work at 5 a. m. As was his custom, he called his wife at 8:45 a. m. He asked her to pick up a bottle of Pepto Bismol if she went to the drugstore and added that he would not work overtime if he didn't feel any better by 1:30 p. m. At approximately 2:40 p. m., after talking to Louis Williams for 4 or 5 minutes at his work area, the employee went limp and fell.

In response to the questions of the compensation judge, Dr. Kapps expounded on his view of the specific etiology of death. The myocardial infarction occurred at least 12 hours before his death which would put it before starting work the day of his death. Although he thought that the thrombus in the right coronary artery probably caused the infarction, he was not certain of this. He felt that this occlusion was not necessarily fatal. He also could not say whether the employee had another myocardial infarction at work.

Dr. Thomas Russell, a cardiologist, testified for the employer. Based on the employee's record of treatment with his family doctor, his medical records with the employer and the autopsy report, Dr. Russell cited cardiac arrest from myocardial infarction

secondary to severe atherosclerotic coronary artery disease as the cause of death. It was his opinion that employment was not a substantial causal factor in employee's death.

On cross-examination, Dr. Russell admitted the possibility of a strain at work the day prior to death causing the infarction. In response to a question of the compensation judge, he attributed the final demise to ventricular fibrillation or ventricular standstill or absence of electrical activity.

The compensation judge found that the employee's heart attack arose out of and in the course of his employment. The board found that the evidence as a whole supported that determination and our examination of the record leads us to the same conclusion. Accordingly, the decision of the board will not be disturbed on appeal.

Respondent is allowed attorneys fees of $350 on this appeal. Affirmed.

PETERSON, JUSTICE (dissenting).

Decedent employee died as the result of a cardiac arrest occurring during his workday. The issue is whether his death arose out of his employment. The decision of the Workers' Compensation Board adopting the findings of the compensation judge is notable for failure to consider the medical evidence essential to decision. It is clear beyond dispute that decedent suffered from a severe and progressively worsening atherosclerotic condition of the heart—in the words of claimant's own expert medical witness, Dr. Frank Kapps: "He was ill. This was a borrowed-time heart, so to speak."

It is settled at the outset that the burden is upon the petitioner to establish a causal connection between the employment and the injury, in this case the fatal heart attack. Dudovitz v. Shoppers City, Inc. 282 Minn. 322, 164 N. W. 2d 873 (1969). The board itself has in the past recognized that "[t]he mere fact that the heart symptoms developed concurrently with the work activities does not raise an inference of causal relation to the employment and is not sufficient to establish a basis for compensability in

the absence of conclusive evidence to the contrary," Kolflat v. Northern Ordnance Co. 23 W. C. D. 399, 402 (1965), affirmed, 274 Minn. 104, 142 N. W. 2d 588 (1966), for, as the board itself later elaborated, "[m]ost employees work a minimum of eight hours a day, or 1/3 of the day, and therefore many people die of heart attacks while on the job," Stibbs v. Northwest Airlines, Inc. 24 W. C. D. 18, 20 (1966), affirmed, 277 Minn. 248, 152 N. W. 2d 318 (1967). And in Stibbs the board cited its prior decision in Brumfield v. Hennepin County, 21 W. C. D. 29 (1959), which stands for the proposition that care must be exercised in evaluating the physical and mental stress on the job in cases involving heart attacks, lest the requirement that a heart attack arise out of employment be effectively eliminated from the workers' compensation statute. If it were otherwise, the workers' compensation statute would become an unintended form of life insurance.

Our review of the board's findings of fact is, of course, limited to determining whether those findings have "sufficient basis of inference reasonably to be drawn from the facts," MacNamara v. Jennie H. Boyd Trust, 286 Minn. 163, 166, 177 N. W. 2d 398, 400 (1970); and if the opinions of medical experts differ as to the causal relationship between a heart attack and a person's employment, and if there is credible evidence upon which the board's finding is based, we will not substitute our judgment for that of the board as to which is the preferred opinion, Dudovitz v. Shoppers City, Inc., *supra*. We are not, however, bound by assumptions or inferences made by the board without substantial support in the record, Jones v. Schiek's Cafe, 277 Minn. 273, 152 N. W. 2d 356 (1967), and "[i]f the findings of the commission are unsupported by competent evidence they cannot stand." Johnson v. D. B. Rosenblatt, Inc. 265 Minn. 426, 431, 122 N. W. 2d 31, 34 (1963).

It is clear from this record that the work duties of the decedent were not taxing, notwithstanding the unsupported determination of the compensation judge apparently to the contrary.

A detailed breakdown of his activities during a typical workday is as follows: For 2 to 2 1/2 hours per day he inventoried parts, either by hand count or visual check; for 1 to 1 1/2 hours he unpacked 3- to 5-pound vinyl door panels and moved them about 10 feet to storage bins; for 1 1/2 hours he sat at his desk updating parts inventory records; for the balance of his time he had little else to do. The overtime work which he performed was generally of the same nature. The lifting of door panels, upon which the commission's findings seem to be based, involved the transfer of 3- to 5-pound door panels from cartons to storage racks during the first hour of his work on the date of his death, but in the last hour of his work preceding his death he was virtually at rest, simply engaged in casual conversation.[1]

We turn then to the critical medical evidence, which consists of the expert testimony of Dr. Thomas Russell, a cardiologist called by the employer, and of Dr. Frank Kapps, the physician who performed the autopsy upon decedent, called by respondent. Both medical experts agreed that two basic nonemployment factors were of sufficient causal significance to have contributed to his heart condition and demise: decedent's "very high blood pressure" and his overweight. Dr. Russell included as an additional factor decedent's abnormally high blood cholesterol levels. Both agreed that decedent suffered a myocardial infarction at least 12 hours prior to the time of his death and more probably 24 hours prior to his death, thus, no later than 3 a. m. on January 25 and more probably sometime after 3 p. m. on January 24, a period in which decedent engaged in no employment activities whatsoever. The memorandum finding of the compensation judge that "it would appear that the employee experienced his myocardial infarction in the course of his employment some time on January 23, 1973," and that it was aggravated by the work

---

[1] The compensation judge's statement that in working on the door panels decedent "had to stretch upwards with both arms and hands, strenuously pulling, tugging, lifting and taking down" the panels has on this record only tenuous support.

activity on the morning of January 25, is clearly erroneous as without support in the medical evidence.

Dr. Russell, with the benefit of decedent's recorded medical history and the autopsy report of Dr. Kapps, testified that "the cause of his death was a cardiac arrest and this was secondary to a myocardial infarction, which was secondary to severe atherosclerotic coronary artery disease." He did "not feel that his work added to the development of his atherosclerotic coronary artery disease, or that it had anything to do with him having any infarction and subsequently dying of an electrical abnormality of the heart secondary to infarction." [2] The deter-

---

[2] Dr. Russell's more detailed testimony, based upon employee's record of treatment with a Dr. Simmons, the employee's medical record with the employer, the autopsy report of Dr. Kapps, and the hypothetical questions put to him, includes the following: "I feel that through the documentation here on the medical records he had severe hypertensive heart disease, at least severely high blood pressure. He had an elevated blood cholesterol, which even in these records it is stated to be one standard deviation away from the mean in one record, and in another area it is shown to be even at a higher level. That there is evidence, if I may talk about this, that the levels certainly should be much lower and according to the laboratory these are actually spurious levels. And there is evidence particularly from the National Institute of Health, which has been working very hard on this, breaking these things down; that with a level of this, a man's chance of developing coronary heart disease is approximately two times that of the general population. The hypertension is a known risk factor, a very prominent one as far as developing coronary, atherosclerotic coronary artery disease. These things are additive. * * * But he may have had more significant evaluation, particularly in another evaluation called triglyceride. We know that he was overweight. It's not necessarily a bad factor, but it may very well have a bearing on his elevated blood triglycerides. At any rate with this level of cholesterol his risk was markedly increased. We have some evidence here that he smoked, which is another risk factor. I think all these things taken into consideration show that there was a number of substantial risk factors being additive that predisposed this man to having very severe atherosclerotic heart disease with plugging of the vessels to being only pinpoint lumens, without, I feel, the stresses, psychic or physical, being involved in his job, causing much

minative inquiry is whether Dr. Kapps, called by claimant, expressed a contrary medical opinion. He did not, and nothing in

more of a problem and adding particularly to the atherosclerotic disease. I do not feel from this testimony that anything in particular happened that day as best I am able to recollect from this hypothetical, that anything definite happened to this man during that day to precipitate a myocardial infarction. And I am going back to the autopsy report, if I may do that without any objection, that Dr. Kapps and the other physician who performed this autopsy have shown quite clearly, that this infarct was at least 12 hours old and possibly older. And I feel when a man has had this type of thing, this infarction, I feel that it probably occurred before he ever went to work that day. So I do not feel that his work added to the development of his atherosclerotic coronary artery disease, or that it had anything to do with him having any infarction and subsequently dying of an electrical abnormality of the heart secondary to the infarction.

"Q. Would you conclude that Mr. Kleman's death was probably the result of his degenerative atherosclerotic condition?

"A. Yes, I certainly would.

"Q. Once again, to repeat for the Court then, would you conclude that the employment facts related in this hypothetical are in your opinion an insignificant factor in his death?

"A. I certainly would feel so, yes."

\* \* \* \* \*

"Q. \* \* \* Now what is your opinion, which [the thrombus or the myocardial infarct] came first?

"A. As I said, 60 percent of the cases, a coronary thrombosis is present.

"Q. You mean preceding the myocardial infarct?

"A. Yes, preceding the macroscopic evidence of the myocardial infarct. You may have someone that has myocardial infarct and usually you do not see the usual polymorphoneuclear leukocytes coming in to remove the area of necrotic muscles—and many people die and never see any change in the heart muscle. And usually not until 12 to 24 hours later. So I would have to say that this man certainly did not die of an electrical death at work or an outstripping of the myocardium by doing some type of physical work or anything that was too heavy for him, whether it was walking or anything, that caused his death. That if that were the case, he would not have this evidence of a myocardial infarction preceding this by 12 to 24 hours."

the findings or memorandum of the compensation judge or the Workers' Compensation Board asserts otherwise.[3]

Dr. Kapps concurred in Dr. Russell's diagnosis that the employee suffered from severe and worsening atherosclerosis of the heart. It is true that at one point he stated that decedent's employment was "a significant substantial cause of his death through myocardial infarction," but this was in the context of his general opinion that *any* stress, physical or emotional (such as being embarrassed, watching an exciting television program, or dreaming), would cause a greater output of blood and, given the severe condition of his heart, "would be potentially lethal." He acknowledged that his opinion as to the causal relationship of the job was speculative since he could not pinpoint any significant work activity which was causally related to decedent's heart attack. He ultimately concluded that decedent's death was "the result of a severe deteriorated atherosclerotic heart condition as opposed to a specific event." The following are significant excerpts of the testimony of Dr. Kapps:

"Q. Is it safe to say that in a heart of this man, that anything other than very low level of heart activity would cause an increased strain on the heart and could lead to the type of thing that happened here?

"A. Yes. I suppose it would be fair to say that. He was ill. This was a borrowed-time heart, so to speak.

\* \* \* \* \*

"\* \* \* Any stress, physical or emotional, that would increase cardiac work would be a stress that would be potentially lethal to the heart.

\* \* \* \* \*

---

[3] The only mention of the medical testimony is contained in the dissenting opinion of Commissioner James Pomush, who reached this conclusion: "\* \* \* The record is far more indicative that the employee died as a result of his far advanced coronary artery disease than from his work. There is neither anything in his work history nor in any isolated work event that can be said to have probably caused his death."

"Q. Would it be possible to place any quantitative value on the various things we have talked about as being causal in his death? That is, rate them?

"A. I would probably have to say, rate weight and hypertension almost equally. These are—since I know absolutely nothing about his employment, other than what I have been told—but from the physiologic causes, I would have to say he was overweight, he was severely hypertensive. Both of these are well known predisposing factors to the development of atherosclerosis.

"Q. And in comparison to these factors, could you state that the employment as described by Mr. Bernet in his hypothetical was a significant causal factor?

"A. It depends on the individual and how he would take things and how his personality would relate to the job and how much of him he puts into the job. If he were a conscientious man who tended to be a little tense and nervous and worried about things, I would say yes, this would contribute to his hypertension and tension in general, yes.

"Q. But you don't know these facts; so to some extent your opinion on causal relationship of the job is speculative then?

"A. It has to be.

"Q. If it was determined that in fact Mr. Kelman's job was one in which he was basically allowed to set his own pace, that is, he was not rushed, that the physical activity of the job was no greater than what you find in non-employment, everyday waking life, would your opinion with regard to the causal relationship of the employment change?

"A. Well, the physical stress is a part of it, and emotional stress is a part of it, and, you know, if the man was—you could have a dish washer that takes his job more seriously than an executive. And we see just as many dish washers die as executives. And if he took his job seriously and it created emotional stress for him, yes. I don't know. It would create more work, yes, than sitting down all day, if he was up walking around and lifting things.

"Q. But don't we normally get up and walk and lift things in our non-employment activities? If his job was in fact composed of sitting, standing, lifting, isn't that a fairly accurate description of our average non-employment life?

"A. It probably is, but every bit of activity causes increased cardiac work.

"Q. Just to make a distinction here, though, this is not a case where you could pinpoint the causal relationship of the individual activities as in the case where the individual had been doing strictly heavy work, as to the period just prior to death?

"A. No. I could not from my autopsy pinpoint that, no.

\* \* \* \* \*

"Q. As a result of the discussion we just had about the causes of death and especially your emphasis of the atherosclerotic condition and exactly how narrow those openings were, would it be your opinion that this individual's death was the result of a severe deteriorated atherosclerotic condition as opposed to a specific event?

"A. Yes."

I respectfully dissent and would reverse.

OTIS, JUSTICE (dissenting).

I join in the dissent of Mr. Justice Peterson.

ROGOSHESKE, JUSTICE (dissenting).

I join in the dissent of Mr. Justice Peterson.

KELLY, JUSTICE (dissenting).

I join in the dissent of Mr. Justice Peterson.