Herman **KLAPPERICH**, Respondent,

v.

**AGAPE HALFWAY HOUSE, INC.,** et al., Relators.

No. 49109.

Supreme Court of Minnesota.

June 8, 1979.

Richards, Montgomery, Cobb & Bassford, Jerome C. Briggs and Rebecca L. Moos, Minneapolis, for relators.

Laurence F. Koll, St. Paul, for respondent.

Heard before ROGOSHESKE, TODD, and WAHL, JJ., and considered and decided by the court en banc.

TODD, Justice.

Herman Klapperich was employed as director of Agape Halfway House, Inc. He claimed his job caused him mental stress and strain. Klapperich suffered from arteriosclerosis. He suffered a heart attack while assisting his son in home repairs. The Workers' Compensation Court of Appeals awarded Klapperich 15–percent permanent partial disability, temporary total disability, and medical expenses on the grounds that his employment was a substantial contributing factor in bringing about his heart attack. We reverse.

Klapperich had been a blacksmith from 1947 to 1974 when an accident precluded his continued employment in this field. He also had problems with excessive drinking until 1961, when he became involved with Alcoholics Anonymous. His involvement with AA and additional educational training qualified him as counselor in the field of chemical dependency. In 1974, he was appointed the first director of Agape Halfway House, a rehabilitation center for chemical dependents. He supervised a staff of one full-time counselor, several part-time counselors, a part-time secretary, and two cooks. Agape had a capacity for 16 resident patients. Originally Klapperich and his wife resided at the house but subsequently moved to an apartment nearby.

In addition to supervising the staff, Klapperich was responsible for preparing the annual budget, obtaining grant funds, soliciting patients (which required some travel),[1] some individual counseling of patients, minor repair and maintenance tasks, and occasionally being called out at night to assist in the handling of a patient. Klapperich testified that he worked 60 to 80 hours per week, but this claim was disputed by members of the board of directors of Agape. In addition, Klapperich was experiencing a personal problem with his full-time counselor. He testified that he understood that his job was at stake if he could not resolve his problem. However, the evidence established that there was no factual basis for this claim and that the board had discharged the counselor and then given her 90 days to straighten out her problems with Klapperich or her discharge would be final.

---

1. Agape required occupancy of 11 patients to break even and proposed budget increases would raise the break-even occupancy rate to 13.

It further appears the Klapperich was in the process of preparing his annual budget prior to a scheduled board meeting on March 8, 1976. Although the budget was not to be presented at this meeting, Klapperich had worked additional time immediately prior to the meeting so as to have his rough draft figures available at the meeting.

On Friday, March 5, 1976, Klapperich took a day's vacation and left with his wife to visit their son in a nearby community. Klapperich's son was engaged in remodeling the bathroom of his home and was being helped by his brother and father. Klapperich performed certain light cleanup tasks on Saturday and furnished some supervision. After church on Sunday, he physically assisted in finishing the ceiling. He stood on a table holding a can of spackle material in his left hand, applying it overhead with a putty knife held in his right hand. This work activity lasted about 1¾ hours. Klapperich then rested and had coffee. He felt dizzy and went outside for air. Later that evening his wife drove him home, having to stop once to allow him to again get some fresh air. That evening he was taken to the hospital where it was determined that he had suffered a myocardial infarction.

At this time, Klapperich, who was 5 feet 5 inches in height, weighed 195 pounds, smoked 6 to 8 cigars a day which he inhaled, drank up to 50 cups of coffee per day, and did no physical exercise. The examination at the hospital disclosed that he had an arteriosclerotic heart disease which caused a narrowing of the right coronary artery.

Klapperich filed a petition for temporary total and permanent partial disability benefits. He testified that in the days immediately preceding his heart attack he was subject to mental stress and strain at his employment. He bases this claim on his concern that the occupancy rate was below the break-even point, that he had been working extra hours in preparing his annual budget, and that he intended to raise an issue at the March 8 meeting regarding another incident with the full-time counselor. The record does not disclose that Klapperich communicated any problem of stress and strain to anyone prior to the occurrence of the heart attack. Rather, the evidence indicates that he was very relaxed while at his son's home. Further, testimony of board members described Klapperich as a very calm individual with no outward manifestations of stress, strain, or overwork. His son observed nothing unusual about his father while at his house immediately prior to his becoming ill and described him as "joking as usual."

Dr. Peter Cermak testified on behalf of Klapperich. He was not the treating physician, but had examined Klapperich for purposes of testifying. He concluded that the stress and strain of Klapperich's employment was a substantial contributing factor to the occurrence of the heart attack. He based his conclusions on the statements given to him by Klapperich as to facts of stress and strain at Klapperich's occupation.

Dr. Raymond Scallen testified on behalf of the employer. He did not examine Klapperich, but attended the hearing, examined the hospital records, and listened to Dr. Cermak. Dr. Scallen disagreed with Dr. Cermak's conclusion and testified that the heart attack occurred because of Klapperich's physical condition and the strain of physical labor involved in spackling the ceiling.

The referee awarded temporary total disability, 10-percent permanent partial disability, and medical expenses. He based his findings on the grounds that the record supported the opinion of Dr. Cermak that Klapperich's employment was a substantial contributing factor to the occurrence of the heart attack. The Workers' Compensation Court of Appeals affirmed the decision of the referee and increased the percentage of permanent partial disability to 15 percent and increased the period of temporary disability. In its memorandum accompanying its decision, the court of appeals described this case as another where "we again see the diversity of opinion which exists among medical experts."

The issues presented are:

(1) Does the evidence support the finding that Klapperich's mental stress and strain were medically related to his myocardial infarction?

(2) Even if the mental stress and strain were medically related to the infarction, was the causal connection insufficient as a matter of law for recovery of workers' compensation benefits?

1. Dr. Cermak testified that Klapperich's work-related stress and strain were a substantial cause of the myocardial infarction. After acknowledging that Klapperich was a classic potential heart attack victim, considering such things as his consumption of 50 cups of coffee per day, his daily smoking of 6 to 8 cigars, his obesity (45 pounds overweight), his arteriosclerosis, his age of 53, and his high cholesterol, Dr. Cermak testified as to the effects of stress by stating:

> "From a physiological standpoint the effects of stress are as I said. There is a release of adrenalin or—adrenalin by the body. The effects of adrenalin are multiple but in terms of its vascular effects it increases the heart rate, it increases blood pressure, it increases myocardial contractility, and these are three known major factors which increase myocardial oxygen consumption. Adrenalin, which is also a physiologic response to stress, increases what we call ectopic automaticity of the heart, but what that simply says is that if you are under stress where there is a lot of adrenalin released by the body, the body is more—more susceptible to myocardium arrhythmia, and since these physiologic responses to stress are characterized by this high adrenalin release it is my opinion then that by increasing oxygen demands on the heart that in the right situations the demands can exceed the supply and infarction can ensue."

This opinion is premised on the existence of stress and strain of a sufficient degree to actuate the flow of adrenalin. He further testified that the stress involved must be of a high level in order to be a significant factor. However, Dr. Cermak's assumption as a fact that Klapperich had a high level of stress was based only on the statements by Klapperich given to him for purposes of examination. At the hearing, Klapperich had testified that he understood the terms "cope" and "stress." At an earlier deposition, Klapperich had testified he was able to cope with the stress of his employment at Agape. At the hearing, he said that he guessed he would say no to the question. Counsel for the employer sought to examine Dr. Cermak about this evidence, and the following quoted testimony is indicative of Dr. Cermak's total reliance on Klapperich's subjective state of mind, recited to the doctor long after the occurrence of the heart attack:

"Q Now, you know what the word cope means, and stress, don't you?

"A Yes.

"Q Now, at least up until March 6, 1976, when he's back in your office hypothetically again, you have this individual who liked his job, was a successful qualified counselor, the people who hired him, the board of directors liked him, he had no physical or emotional or mental complaints or symptoms, and he had for two years essentially—or just about two years had been performing the task of being the director, and on the 6th of March, '76 wouldn't you say that that person had been able to cope to the stresses of the job?

"A *I don't think I would say that from the story I got from Mr. Klapperich.*

"Q I'm just—I have just given you another story, the story just—

"A No.

\*     \*     \*     \*     \*     \*

"THE COURT: He's asking him to assume a set of facts. It's in the record, I think, and substantiates the question. Doctor, you should respond to the question asked by counsel, and if you need some further explanation necessary, he can give it.

"THE WITNESS: *If he's coping with his job and he's comfortable*

*with his job and successful with his job, that is fine.*

"Q (By Mr. Briggs, continuing) That, sir, is the fact as of March 6, 1976, one day before the heart attack.

"A *In my discussion with Mr. Klapperich I didn't think that was the case.*

"Q I am not asking to argue with you. I have asked you to assume facts which are in evidence, and I am just asking you to assume those very facts and based on those facts it would indicate that he was able to cope with any stress or emotional problems he was confronted with, isn't that right.

"A Yes." (Italics supplied.)

Dr. Cermak also acknowledged that Klapperich's physical exertion in installing the ceiling could have contributed to the myocardial infarction.

Dr. Scallen, testifying for the employer, disagreed with the conclusion of Dr. Cermak. Dr. Scallen attributed the cause of the infarction to the strain of the ceiling work superimposed on Klapperich's underlying physical condition. Dr. Scallen testified:

"It would be my opinion that he had underlying significant coronary heart disease or so-called atherosclerosis of the coronary artery and that the exertion at the time when he was very vulnerable with narrowing there, using his arm over the head, was sufficient to produce a prolonged period of increased demand on the heart for blood and oxygen which was not possible with some narrowing in his coronary artery—probably the right coronary artery—and as a result of this he sustained myocardial infarction."

Dr. Scallen was also asked questions concerning the correlation between stress and myocardial infarction. Dr. Scallen recognized that stress might be a precipitating cause, but only if it was severe. He further testified:

"Q Now, Doctor, you were present when Dr. Cermak apparently testified that he thought that the chronic tension and stress over a period of time that

was experienced by Mr. Klapperich was a cause of the heart attack, isn't that right?

"A I believe that's correct.

"Q Now, is there a distinction between a chronic stress as opposed to an acute episode of stress?

"A Yes, very definitely.

"Q And what— Will you kindly explain the difference and how that affects the heart?

"A Well, with an acute and relatively severe emotional stress there are a lot of physical concomitants that go along with that. A discharge of adrenalin into the body which increases the pulse rate very significantly causes increased demand for oxygen consumption, and in a patient who has underlying coronary heart disease that may prove to be deleterious to him, *but we are talking about sudden severe emotional stress, great fear, great anxiety, great anger, something of that nature. Not low-grade chronic nervousness or feeling that you are under some pressure.*" (Italics supplied.)

After evaluating this expert testimony, the compensation judge adopted the conclusions of Dr. Cermak and found that the stress and strain of Klapperich's job were a substantial contributing cause of the myocardial infarction. This court has repeatedly stated that such finding of fact from conflicting expert testimony will not be disturbed unless a consideration of all the evidence and the inferences permissible therefrom clearly requires reasonable minds to adopt a conclusion contrary to that of the compensation court. *Zingelman v. Wisniewski*, 265 N.W.2d 653 (Minn.1978); *Saholt v. Northwest Airlines, Inc.*, 290 Minn. 393, 188 N.W.2d 772 (1971). Agape argues that Dr. Cermak's testimony should be disregarded because it is based upon speculation and is equivocal. We reject this argument since an examination of the record discloses sufficient testimony of Dr. Cermak so as to permit a conclusion that the stress of Klapperich's employment, if it exists,

could be a substantial contributing cause of the infarction.

■ However, the problem presented by this case is the assumption by Dr. Cermak that Klapperich was under such a degree of stress at his employment so as to create the physical condition described by both medical experts which results in the discharge of excess adrenalin in the body. Contrary to the conclusion of the court of appeals, we do not regard this case as a typical one involving a difference of medical opinions. Rather, a close examination of their testimony discloses very little difference in the medical opinions. Both testified that *unusual* or *significant* amounts of mental stress can release adrenalin into the blood which can lead to a myocardial infarction. Both also testified that Klapperich's exertion from spackling for almost 2 hours placed a great strain on the heart which very probably contributed to the infarction. Thus, the experts generally agreed as to the relationship between mental stress, physical stress, and infarctions.

The reason the experts differed in their ultimate conclusions was that Dr. Cermak understood Klapperich's mental stress to be very significant, whereas Dr. Scallen understood Klapperich's mental stress to be relatively insignificant. Both testified that only significant or unusual mental stress would cause the infarction. Thus, the critical question on this appeal is not really whether one expert opinion should be accepted over another, but rather whether the evidence justifies Dr. Cermak's assumption that Klapperich was under severe mental stress.

We conclude that the record does not disclose evidence which supports a finding that Klapperich was exposed to unusual or significant amounts of mental stress. Klapperich, in statements made after the infarction, sought to so characterize his condition, and his evaluation was accepted without question by Dr. Cermak. However, Klapperich gave no express or outward manifestations of such stress prior to the infarction. On the contrary, he was described as being very calm and his usual "funny" self. He made no complaints to anyone about his alleged condition. His physical appearance did not change. He evidenced no emotional changes. This total lack of objective symptoms precluded Dr. Cermak's assumption as fact that statements made by Klapperich after the infarction accurately establish the degree of stress which both medical experts stated was required to cause the infarction. Therefore since we conclude that there is no factual basis to support Dr. Cermak's conclusions, we must disregard them. Absent this medical evidence there is no basis to allow an award of compensation to Klapperich.

■ 2. Having disposed of the case, we need not consider whether the test of legal causation was satisfied. However, we do observe that the establishment of medical causation from a work-related activity does not in and of itself establish legal causation for purposes of awarding workers' compensation benefits. This is so because such medical causation might be so insignificant or happenstance that the work-related activity cannot be said to be a substantial contributing cause of the heart attack. See, generally, Larson, *The "Heart Cases" in Workmen's Compensation: An Analysis and Suggested Solution*, 65 Mich.L.Rev. 441, 468. See, also *Kleman v. Ford Motor Co.*, 307 Minn. 218, 239 N.W.2d 449 (1976).

Reversed.