Raymond H. EGELAND, Respondent,

v.

CITY OF MINNEAPOLIS,
Self-Insured, Relator.

and

Raymond H. EGELAND, Relator,

v.

CITY OF MINNEAPOLIS, Self-Insured,
Respondent.

Nos. C8–82–1630, C9–82–1667.

Supreme Court of Minnesota.

Feb. 3, 1984.

598

J. David Abramson, Asst. City Atty., Minneapolis, for City of Minneapolis, for relator-respondent.

Gerald R. Freeman, Freeman, Gill, Egan & Keating, Minneapolis, for Raymond H. Egeland, for respondent-relator.

AMDAHL, Chief Justice.

Two separate writs of certiorari were issued in this case as a result of a single decision by the Workers' Compensation Court of Appeals (hereinafter WCCA). Since identical operative facts are involved, the cases have been consolidated for consideration.

The employee, Raymond Egeland, formerly a policeman with the Minneapolis Police Department, claims that he suffers from peptic ulcer disease and chronic anxiety and depression which were caused by job-associated stress. Workers' Compensa-

tion Judge Parker found that Mr. Egeland suffered personal injury in the nature of depression and a duodenal ulcer arising out of and in the course of employment. The stresses of his job as a policeman were found to be a substantial contributing factor toward such injury. The judge concluded that our determination in *Lockwood v. Independent School Dist. No. 877*, 312 N.W.2d 924 (Minn.1981), precluded compensation for disability resulting from the depression. He found a 25% permanent partial disability of the duodenum on the basis of the body as a whole and awarded Mr. Egeland 125 weeks of permanent partial disability at $226 per week in the sum of $28,250 plus medical expenses related to the ulcer and attorney fees.

The employee appealed the decision not to grant temporary total disability benefits as well as several of the findings of fact and conclusions of law.

On appeal, the judgment was upheld as were all of the findings of fact but only the duodenal ulcer and not the depression was held to have arisen out of and in the course of Mr. Egeland's tenure with the police department. The majority on the Appellate Court was divided as to the rationale for the noncompensability of the depression. Two of the judges determined that Mr. Egeland suffered from "perceived" rather than "actual" stress and that "perceived" stress was not compensable. A third judge refused to accept the distinction between "perceived" and "actual" stress but found that our *Lockwood* decision precluded compensation for solely mental injury.

The dissenting judges believed that the employee had not carried his burden of showing objective significant manifestations of stress as a causal factor in both the ulcer disease and the depression. One judge refused to accept the tenet that work as a police officer was inherently stressful or that the evidence established that Mr.

Egeland's work caused either his ulcer or his depression.

■ We do not accept the majority's adoption of a distinction between "perceived" and "actual" stress. Nor do we need to decide whether Egeland's depression arose out of and in the course of his employment. That determination has no relevance to the decision here because, even if it did, under *Lockwood* such mental injury is not compensable under the Workers' Compensation Act, Minn.Stat. § 176.-021, subd. 1 (1980). We affirm the award of 25% permanent partial disability for the physical injury in the form of a duodenal ulcer and we note that this is the first time in Minnesota that a stress-induced ulcer has been found to be compensable under the Workers' Compensation Act.[1]

### a. Work and Medical History

Raymond Egeland began full-time employment with the Minneapolis Police Department in 1962 at 42 years of age after 17 years of working for the Great Northern Railroad. For most of his employment he worked as a "tramp" patrol officer for the Second Precinct, that is, he worked monthly rotating eight hour shifts and received daily assignments without advance knowledge about whether he'd be walking a beat or riding in a patrol car, or who his officer-partner would be.

Between 1970 and 1973, at his request, he was classified as a jailer even though the Second Precinct had no jail. He worked only day shifts, did maintenance work and answered the phones. In May of 1973 he was reassigned to patrol duty and rotating shifts.

Fairview Hospital's records are unclear as to whether it was Mr. Egeland or his wife who was treated for an ulcer condition in 1951 or 1953. But a duodenal ulcer was unequivocally diagnosed and confirmed by X-ray in September of 1965. By May of

---

**1.** An employer in Minnesota is liable for compensation "in every case of personal injury or death of his employee arising out of and in the course of employment without regard to the question of negligence." Minn.Stat. § 176.021, subd. 1 (1980). "Personal injury" is defined "as injury arising out of and in the course of employment and includes personal injury caused by occupational disease; * * *." Minn.Stat. § 176.011, subd. 16 (1980).

1968, he had to be admitted to Fairview Hospital for 4–7 days with severe ulcer problems manifested by pain and vomiting. X-rays revealed a fairly severe duodenal deformity with an acute ulcer crater. Mr. Egeland treated his symptoms with a modified diet and Maalox.

While on a vacation cruise in 1976 he suffered a severe ulcer attack and lost time from work. In December of 1977 a sick leave extending almost a year became necessary due to the severity of both his stomach and his nerve problems.

Mr. Egeland applied for and received a 6-month disability pension in May of 1978. During this period he lost 30 pounds, but he began treatment with the new drug Cimitadene (Tagamet) which greatly alleviated his symptoms.

Upon returning to active duty in October 1978, Egeland was assigned to the police supply room. Although his stomach condition seemed to be coming under control, his depression became more severe.

About 2 years after her husband joined the police force, Mrs. Egeland had begun to notice a change in his personality. He became depressed and uncommunicative and lost all interest in friends and social activities. The depression advanced significantly over the years so that by 1980, Dr. Philander, a psychiatrist who testified on behalf of the City, described Mr. Egeland's depression as a "state of near catatonic autism" and profound depression.

Beginning in the spring of 1978 Egeland was referred by the police department to a number of physicians, each of whom diagnosed chronic depression which aggravated his chronic ulcerative disease.

Egeland's supply room job was reclassified as a civilian position in January of 1980. The four physicians who saw him at that time concluded that he had no active ulcer disease since his use of Tagamet for one week out of each month controlled his symptoms. But all the doctors agreed that his endogenous depression, chronic anxiety reactions and nervous exhaustion rendered him incapable of performing any other position within the police department.

On May 7, 1980, Egeland applied for Workers' Compensation benefits which were denied. By 1982, the depression had largely dissipated and his ulcer was well under control. Currently retired and living at his cabin in Danbury, Wisconsin, he receives a disability pension and railroad retirement benefits. The move to the country has been therapeutic and, at 64 years of age, he has no plans to seek employment.

During the years between 1966 and 1975, Mr. Egeland suffered a series of personal tragedies. In May, 1966, his grown son drowned in a fishing accident. One of his brothers died of cancer in 1971, another of the effects of alcohol abuse in 1972, and another brother committed suicide in 1975. His wife underwent three back operations within the same time span.

Additionally, he seems largely to have ignored the advice of his doctors that he quit smoking and drinking coffee. In 1974 he was drinking 10 cups of coffee and smoking 2 packs of cigarettes per day. At the time of trial those amounts had only been reduced to 4–6 cups of coffee and 1½ packs of cigarettes per day.

### b. Medical Testimony

Each party called three expert witnesses, all of whom agreed that in 1980 Mr. Egeland was severely disabled with both ulcer disease and extreme endogenous depression. Their opinions differed, however, as to the cause of his depression, his current physical and psychological status and his employability. Dr. Flint, Dr. Tombers and Joseph Steen testified for Mr. Egeland.

Dr. Flint, a psychologist, believed that the employee was disabled by depressive neurosis caused in significant part by his work as a policeman. In Dr. Flint's view Mr. Egeland was incapable of performing any labor he might see as demeaning since his depression would then be exacerbated.

Dr. Joseph Tombers, a board certified gastroenterologist, testified that while Mr. Egeland has no active ulcer disease at

present, he has a 25 to 30% permanent disability of the duodenum. The onset, aggravation and continued activity of the employee's peptic ulcer, according to Dr. Tombers, was significantly caused by his work as a policeman. Dr. Tombers asserted that Mr. Egeland could work only in highly selective types of employment.

Joseph Steen, a rehabilitation psychologist, diagnosed a depressive reaction associated with a physiologic reaction caused by Mr. Egeland's employment with the police department. Mr. Steen believed these symptoms would redevelop if Mr. Egeland returned to the force or to an occupation of lower status but that he was not a malingerer and could fulfill some jobs.

None of the three experts who testified for the City of Minneapolis believed that Mr. Egeland's employment with the police force was a substantial factor in his ulcer disease or his depression. Dr. Dean Rizer, an internist, found Mr. Egeland was constitutionally predisposed to ulcer disease, that he generated his own tensions internally and that environmental stress factors were not important. Dr. Philander, a psychiatrist, agreed and also concluded that while Mr. Egeland's depression was disabling in 1980, by 1982 it had spontaneously improved and his ulcer was under control. According to Dr. Haber, a psychologist, Mr. Egeland was capable of light clerical, janitorial, security or assembly work and these would not be demeaning to him.

Mr. Egeland was unable to identify specific stressful incidents that occurred during his employment as a police officer. But the frequent changing of shifts and partners, the "gung ho" attitude of younger patrolmen, the derogatory attitude of the public towards police officers and the political battles within the department were all stress-creating situations for him.

■■■ The standard of review in workers' compensation cases is well established. The facts are viewed in the light most favorable to the findings of the WCCA. *McClish v. Pan-O-Gold Baking Co.*, 336 N.W.2d 538 (Minn.1983). In the case at bar, the WCCA largely affirmed the find-

ings of fact of the compensation judge. These findings will not be disturbed unless they are manifestly contrary to the evidence "or unless the evidence clearly requires reasonable minds to adopt a contrary conclusion." *Id.* at 541. The resolution of conflicting expert testimony is the function of the trier of fact. *Nibbe v. City of St. Paul*, 320 N.W.2d 92, 93 (Minn.1982). *See also Fredenburg v. Control Data Corp.*, 311 N.W.2d 860, 863 (Minn.1981).

The City of Minneapolis attacks the factual findings of the WCCA on two separate grounds. Firstly, Mr. Egeland's lifestyle was itself conducive to the development of an ulcer. Dr. Rizer and Dr. Tombers testified that heavy coffee drinking, heavy smoking, personal problems and a hereditary propensity (Mr. Egeland's sister also has an ulcer) all are known to correlate with the incidence of duodenal ulcer disease.

■■■ The City also contends that Mr. Egeland has not established a causal relationship between the nature of his work and his illnesses because he cannot point to any specific episodes of ulcer activity that were linked with specific incidents at work. But, as the City itself points out, "the exact causative factors of peptic ulcer disease are not understood and no single factor can be said to be responsible." The statute only requires that Egeland's work as a police officer be a significant contributing factor in the development of the disease, not the sole factor. *See Aker v. State of Minn. Dept. of Natural Resources*, 282 N.W.2d 533, 535–36 (Minn.1979). Nor does the statute require a finding of a single precipitating incident which caused the disease. *Cf. Forseen v. Tire Retread Company*, 271 Minn. 399, 403, 136 N.W.2d 75, 77 (1965) (disablement compensable if work aggravates preexisting infirmity even if work did not do so because of violent strain or exertion). Moreover, from 1970–1973 and from 1978–1980 when Mr. Egeland was off street patrol and after 1980 when he retired to Wisconsin, he was not subject to severe ulcer attacks. While the use of Tagamet could explain the latest remis-

sions, it does not explain the earlier remission which happened at a time when he was smoking and drinking coffee heavily and experiencing personal problems. However, the fact that Mr. Egeland was not on police patrol and hence was away from stress-inducing situations could explain these remissions. The finding of fact that the stress of being a police officer was a substantial contributing factor to the employee's ulcer condition is, therefore, not manifestly contrary to the evidence.

■ The WCCA, in holding that Egeland's depression was caused by "perceived" and not "actual" stress and hence was not compensable, was applying a test it has itself just recently developed but which has never been articulated or accepted by this court. In *Applequist v. Insurance Co. of North America*, 33 W.C.D. 245 (1980), the employee's contention that her hysterical psychosis was caused by an environment that was stressful because of an overload of work and continuous noise distractions was refuted by a fellow employee who testified that the workload was not overwhelming and the noisy environment was not even close to the employee's work station. Judge Rieke, of the WCCA, in his concurrence, rejected the Michigan court's acceptance of an "honest perception" subjective test of stress formulated in *Deziel v. Difco Laboratories, Inc.*, 403 Mich. 1, 268 N.W.2d 1 (1978).[2] Judge Rieke paraphrased the dissent in *Deziel* and stated that a person with a mental disorder is "often unwilling to recognize the cause of his or her emotional disability and will, therefore, affix his problems upon an unrelated factor such as his or her employment." *Applequist*, 33 W.C.D. at 253. He concluded that the use of the Michigan test would diminish the causal connection to employment test required of the statute to a "meaningless ruse." *Id.* at 254. Hence, Judge Rieke attempted to adopt a test based on objective facts and standards, refusing compensation because the emotional disability was precipitated by incidents or

experiences which were honestly perceived but in reality nonexistent.

The same test was applied twice in 1981. *See Strand v. Ramsey County and The Wilder Foundation*, 34 W.C.D. 181 (1981); *Green v. First State Bank of White Bear Lake*, 34 W.C.D. 151 (1981). In *Green*, the employee suffered hyperventilation and anxiety which was diagnosed as depression caused by her perception that she was being passed over for promotion. This equaled medical causation in the WCCA's view but not legal causation since there was no factual basis proven to support her perceptions. The record did not show she had been exposed to significant or unusual stress. In *Strand*, the WCCA further explained the *Applequist* rationale. When an employee who is suffering from a preexisting psychological disorder has a perception of a stressful work environment which is not supported by any objective evidence, legal causation cannot be established. Mr. Strand suffered anxiety and depression ostensibly due to the pressures and stress of his daily work. But in addition to insufficient proof of medical causation, there were no specifics of the work situation discussed in the testimony, no evidence of outward manifestations of stress and no objective facts to determine legal causation.

As previously discussed, the facts as established in the record of Mr. Egeland's case do not coincide with the facts of the WCCA decisions. At trial, there was a great deal of evidence of outward manifestations of stress and of specifics in the work situation such as continual changes in shifts that were actually stress-producing. This distinction between actual and perceived stress seems to be purely semantical and does not square with lay or professional experience. To say that one person suffers from perceived stress and another from real stress makes as little sense as saying that one person has perceived back

2. The Michigan court held that an employee who factually establishes that he or she honestly perceives some personal injury in the workplace is entitled to compensation.

pain while another has real back pain.[3] Professor Larson, in his article *Mental and Nervous Injury in Workmen's Compensation*, 23 Vanderbilt L.Rev. 1243, 1243 (1970), speaks of the "poignant judicial cry of the past"; "how could it be real when * * * it was purely mental?" The *Deziel* court stated in response: "This 'poignant judicial cry' can only be explained if it is understood that *all* people manufacture their own concepts of reality." 403 Mich. at 30, 268 N.W.2d at 12. (Emphasis in original). Moreover, all stress experienced by a person is necessarily "perceived" before it can cause any reaction within the person at all. The theoretical position advanced by the Workers' Compensation Court of Appeals in so far as it applies a "perceived" versus an "actual" reality test is therefore unacceptable.

What seems to be the crux of the WCCA's earlier three decisions is the idea that it is important to establish factually the existence of stress in the workplace other than by means of the disabled employee's own testimony. This position is consistent with the Minnesota Supreme Court's prior holdings. For example, in the case of *Klapperich v. Agape Halfway House Inc.*, 281 N.W.2d 675 (Minn.1979), this court set out a two-step test for determining causation of stress-induced myocardial infarction: (1) Is there sufficient factual evidence to conclude that mental stress and strain were medically related to the infarction? (2) Was that causal connection sufficient for a finding of legal causation under the statute? 281 N.W.2d at 679–80. In *Klapperich* the stress involved was not found to have been of sufficient degree to have activated the flow of adrenalin and increased the oxygen demands on the heart. *Id.* at 680. There was no evidence

in the record that Mr. Kapperich was exposed to unusual or significant amounts of mental stress and he gave no outward manifestations of such stress prior to the infarction. *Id.*

Similarly, in *Hough v. Drevdahl & Son, Co.*, 281 N.W.2d 690 (Minn.1979) (per curiam), evidence that the employee had to drive in heavy traffic and suffer scoldings by his employer if he failed to make a sufficient number of hauls each day, was held to be "not significantly different from the stress to which ordinary living exposes everyone." *Id.* at 692.

By way of contrast, in *Aker v. State of Minnesota*, 282 N.W.2d 533 (Minn.1979), the court found that Aker's removal of two decomposed bodies from a campsite represented such extreme emotional or mental stress as to have caused his myocardial infarction. The testimony of witnesses with regard to his deteriorating physical condition after the incident and the remarks he made about the "ordeal" were very important to the court's finding in *Aker*. 282 N.W.2d at 535. Even though the court did not articulate that it was applying the two-part test of *Klapperich*, such an application seems to be implicit at least in the statement that: "There is *adequate* evidence the employee was subjected to an *extreme* amount of emotional and mental distress by the events of August 13, 1976." *Id.* at 535 (emphasis added).

To prove legal causation, the employee must produce evidence that the stress was extreme as in *Aker*, or at least "beyond the ordinary day-to-day stress to which all employees are exposed." *Lockwood v. Independent School District No. 877*, 312 N.W.2d 924, 926 (Minn.1981).[4]

---

3. In 1954, this court was confronted with parallel arguments about the existence of pain. The solution proposed is the same as the one which is emerging in the area of stress evaluation:
   It must be conceded that traumatic neurosis is a type of disability that is extremely difficult to accurately diagnose and rests almost entirely upon subjective symptoms. It may be said that the existence of pain when based on subjective symptoms always involves the credibility of the one claiming to have the pain.

* * * [W]e cannot ignore the testimony of witnesses who have observed his conduct over a long period of time.
   *Hartman v. Cold Spring Granite Co.*, 243 Minn. 264, 277, 67 N.W.2d 656, 663 (1954).

4. The *Lockwood* court discussed but did not adopt this test, as urged by a dissenting justice, insofar as mentally-induced mental injury is concerned because it was unwilling to extend worker's compensation to this group of claim-

The test of *extreme* stress logically applies to cases such as *Aker* where a single precipitating cause is at issue. But the test of "beyond day-to-day" stress applies to employees such as Mr. Egeland who have experienced stress that has accumulated over a long period of time.

Mr. Egeland presented sufficient evidence to meet the above-stated test. Two of the judges constituting a majority of the WCCA seem to imply that police work is inherently stressful as compared to other occupations. The fact that under the occupational disease section, Minn.Stat. § 176.011, subd. 15 (1982), police officers are granted a presumption of a causal link between their employment and some specific diseases (myocarditis and coronary sclerosis) which can be stress-induced is an indication that the legislature views police work as *sui generis*. Indeed, this court so stated very forcefully in our recent decision in *Linnell v. City of St. Louis Park*, 305 N.W.2d 599, 601 (1981):

> We construe section 176.011(15), however, to embody the legislature's presumably informed acceptance of the thesis that the occupations of fireman, policeman * * * *are likely to involve greater stress*, whether physical or emotional, or both, than other occupations * * *.

Of course, this action is brought under the "personal injury" section of the statute to which no such presumption of causation attaches. But the same premise that police work is more stressful than most occupations applies. The stresses that most bothered Mr. Egeland are those that are common to police work. As Dr. Philander testified with regard to his interviews with Mr. Egeland in 1980: "[I]t bothered him immensely that he worked a rotating shift. Often he could not return to a regular sleeping schedule" and further, "the clientele that he dealt with in the police department * * * that invariably the type of work or the type of duty he was called upon to perform included the rather unpa-

latable issue of settling domestic problems, barroom brawls * * * you get kicked at and spit at and the whole bit."

It is certainly the case that these types of pressures do not incapacitate the majority of police officers and Mr. Egeland was probably constitutionally predisposed to such injuries. But this fact does not influence compensability under the workers' compensation laws. *See Walker v. Minnesota Steel Co.*, 167 Minn. 475, 209 N.W. 635 (1926):

> The compensation act was designed for the protection of all laborers coming within its purview. That is, it does not apply to those only who are strong in body. Neither is it limited to those only who are normal. Those who are below normal, have a weakness, or carry perchance a disease, are also within its protection. Compensation is not dependent upon any implied assumption of perfect health. It does not exclude the weak or physically unfortunate.

167 Minn. at 476, 209 N.W. at 635.

Compensation Judge Parker and WCCA Judge Adel are correct in holding that compensation for stress-induced depression is precluded by our recent decision in *Lockwood.*

Workers' compensation cases which involve mental conditions such as emotional, nervous, psychoneurotic or psychotic disorders have been classified into three groups by Professor Larson: 1) mental trauma which results in physical injury: 2) physical trauma which results in mental injury, and 3) mental trauma which results in mental injury.[5] In Minnesota, coverage has been extended to the first two categories (*see Aker, supra; Hartman, supra* note 3) but not to the third, although we recognized in *Lockwood* that the majority of courts in the country have held such injury to be compensable. In *Lockwood*, this court refused to permit compensation for work-re-

---

ants. But it is a useful test for measuring the quality and quantity of stress required before an ulcer can be deemed a compensable injury.

**5.** 1B A. Larson, Workmen's Compensation Law, §§ 42.20–.24 (1952 & 1982 Supp.).

lated stress-induced mental disability in the absence of a clear legislative intent to extend coverage to such disability.

The policy determination as to whether workers' compensation coverage should be extended to employees who are mentally disabled by employment-related stress is best left to the legislature. We affirm the award of permanent partial disability to Mr. Egeland for his stress-induced ulcer and deny compensation for the claimed depression.

Neither party shall recover costs or be allowed disbursements or attorney fees.

Affirmed.