**Robert JOHNSON, Jr., Deceased, Employee/Respondent,**

**v.**

**CITY OF PLAINVIEW, Minnesota, League of Minnesota Cities Insurance Trust/Employee Benefit Administration, Employer/Appellants,**

**and**

**Commissioner of Labor and Industry, as Administrator of Peace Officers Benefit Fund, Relator.**

**Ethel HARDEL, spouse of Carl Hardel, Deceased, Employee/Respondent,**

**v.**

**STATE of Minnesota, PEACE OFFICERS BENEFIT FUND, Relator.**

**Nos. C5–88–643, C8–88–653 and C6–88–716.**

Supreme Court of Minnesota.

Nov. 4, 1988.

Peter J. Pustorino, Minneapolis, for City of Plainview.

Jacob Forsman, Amy Borgeson, St. Paul, for Com'r of Labor & Industry and Peace Officers Benefit Fund.

M. John Steward, Boston, Mass., Donald DeVaughn, Plainview, for Robert Johnson, Jr.

Neil J. Jensen, Hutchinson, for Ethel Hardel.

## OPINION

POPOVICH, Justice.

This case arises out of three consolidated appeals relating to the deaths of Robert Johnson, Jr., and Carl Hardel, volunteer firefighters for the cities of Plainview and Brownton respectively.

In the Robert Johnson, Jr., matter, the Worker's Compensation Court of Appeals ("WCCA") affirmed the decision of the compensation judge because (1) the judge correctly applied Minn.Stat. § 176.011, subd. 3 (1984), requiring application of an imputed wage based on the salary paid to full-time firefighters in similar communities, when determining workers' compensation benefits for unpaid volunteers; and (2) Johnson was "killed in the line of duty" and did not die from "natural causes," thereby entitling his dependents to benefits under Minn.Stat. § 352E.04(e) (Supp.1985) (renumbered Minn.Stat. § 176B.04(e) (1986)), the Peace Officers Benefit Fund ("the Fund").

In the Carl Hardel matter, the WCCA reversed the compensation judge and found that Hardel was "killed in the line of duty" under Minn.Stat. § 352E.04(e) and therefore entitled to benefits from the Fund.

We affirm the WCCA's findings that Johnson and Hardel were "killed in the line of duty" and their deaths were not the result of "natural causes" under Minn.Stat. § 352E.04(e). Their dependents are entitled to receive benefits under the Peace Officers Benefit Fund. We reverse the WCCA's computation of worker's compensation benefits for Johnson under Minn. Stat. § 176.011, subd. 3, and remand for a new determination consistent with this opinion.

## I.

*Robert Johnson, Jr.*

Robert Johnson had been serving as a volunteer fireman for the City of Plainview approximately four years at the time of his death. He was on call seven days a week, attended all department meetings and training sessions, and also performed other tasks such as repairing fire trucks. Johnson received $8.00 per hour for the first hour of an emergency call, $5.00 per hour for every hour thereafter, and $2.50 for attending departmental training meetings. Johnson participated in approximately 30 emergency calls each year, and received $180.50 for the six months preceding his death. In addition to being a volunteer fireman, Johnson was managing partner with his father in the Bob Johnson Sports Center, where he earned approximately $142.71 per week.

On February 10, 1985, at about 5:30 a.m., Johnson was called to a fire at the Dittrich residence about a mile and a half outside of Plainview. Johnson arrived at the fire approximately 5:38 a.m. and was involved with three other men in setting up a 1,000 gallon portable drop tank, consisting of 5-foot high pipes holding up canvas liners and weighing approximately 80 pounds. While Johnson was attaching a 55-pound hose to the bottom of the tank, he collapsed. CPR was unsuccessful and John-

son was pronounced dead on arrival at St. Mary's Hospital.

Medical experts testified that Johnson experienced an acute rupture of an aneurysm of his ascending aorta. This rupture was due in part to the fact that Johnson had severe coronary atherosclerosis, a condition he was unaware of at the time of his death. Several experts also testified that the physical and emotional stress involved in fighting the fire was a contributing factor in Johnson's death.

*Carl Hardel*

Carl Hardel, a hardware store operator, was a volunteer fireman with the Brownton Fire Department for almost 30 years. In addition to performing normal firefighting duties, Hardel also took care of any electrical work required at the scene of a fire.

On July 5, 1984, shortly after 6:00 p.m., Hardel was called to a fire near his home. Before proceeding to the fire, Hardel drove to his hardware store to pick up his supply truck and then to the fire hall to retrieve some equipment. Once at the fire, Hardel could see that electrical wires were down and could hear them snapping and crackling. The water being used to fight the fire was also pooling near the downed lines.

Hardel attempted to cut the circuit breakers on the transformers near the downed lines through the use of an extension pole. After 3–5 minutes working unsuccessfully on his own, Hardel was assisted by Brownton Police Chief Mathwig who helped him cut the circuit breakers on one of the transformers, but the lines continued to crackle and Hardel decided to check out a second pole approximately 600 feet away. He proceeded to the second pole but on his way was rendered helpless by severe chest pains. He was transported to the Hutchinson Community Hospital where studies revealed he had suffered an extensive anterior myocardial infarction or heart attack.

Hardel was released from the hospital a week later, but on the same day he arrived home he suffered another attack while sitting at the dinner table. He was transported to the Hutchinson Community Hospital and then transferred to Methodist Hospital in St. Louis Park. Tests at both hospitals showed signs that Hardel had suffered a major stroke. Hardel died at Methodist Hospital on July 15 as the result of complications surrounding these two attacks.

The testimony of several medical experts revealed that Hardel had developed a narrowing of one or more coronary arteries as the result of atherosclerotic plaque formation in the years preceding his death. Hardel, however, was unaware of this condition. Hardel's death was linked to the first attack he suffered while fighting the fire, caused in part by the physical and emotional stress of firefighting.

## II.

1. What formula is appropriate for computing workers' compensation benefits for volunteer firemen under Minn.Stat. § 176.011, subd. 3 (1984)?

2. Were Johnson and Hardel "killed in the line of duty" or were their deaths the result of "natural causes" within the meaning of Minn.Stat. § 352E.04(e) (Supp.1985)?

## III.

Under 1983 amendments to the Workers' Compensation Act, the WCCA must determine on appeal whether a compensation judge's findings and order are supported by substantial evidence in view of the entire record as submitted. Minn.Stat. § 176.421, subd. 1(3) (1986). "[T]he findings are to be affirmed if, in the context of the record as a whole, they are supported by evidence that a reasonable mind might accept as adequate." *Hengemuhle v. Long Prairie Jaycees*, 358 N.W.2d 54, 59 (Minn. 1984).

This court also has a limited scope of review with regard to decisions of the WCCA. The facts are viewed in the light most favorable to the findings of the WCCA. *Hengemuhle*, 358 N.W.2d at 60 (quoting *Egeland v. City of Minneapolis*, 344 N.W.2d 597, 601 (Minn.1984)). WCCA decisions will be overturned only if "it appears that the findings are manifestly contrary to the evidence or that it is clear reasonable minds would adopt a contrary conclusion." *Id.* at 61.

■ Minn.Stat. § 176.011, subd. 3, provides for computing an employee's "daily wage" for worker's compensation purposes:

> "Daily wage" means the daily wage of the employee in the employment engaged in at the time of injury * * *. In the case of persons performing services for municipal corporations *in the case of emergency,* then the normal working day shall be considered and computed as eight hours, and *in cases where such services are performed gratis or without fixed compensation the daily wage of the person injured shall,* for the purpose of calculating compensation payable under this chapter, *be taken to be the usual going wage paid for similar services in municipalities where such services are performed by paid employees.* If, at the time of injury, the employee was regularly employed by two or more employers, the employee's earnings in all such employments shall be included in the computation of daily wage.

(Emphasis supplied.) Johnson's work as a volunteer fireman was performed gratis or without fixed compensation and therefore he was entitled to use an imputed wage in computing worker's compensation benefits. The record shows the chief of the Plainview Fire Department testified the money paid to volunteer fireman was meant to reimburse them for expenses. This policy was also reflected in written proposals submitted by the fire department to the Plainview City Council in order to secure funding for such payments to volunteer firemen. The small amount Johnson received, $180.50 over a period of six months, could not begin to fully compensate him for all his firefighting efforts and must be considered mere reimbursement for expenses, based on the record here.

■ In his computation of Johnson's "daily wage," the compensation judge used an imputed wage of $9.25 per hour or $371.60 per week, the salary paid to full-time firefighters in the nearby City of Rochester. While Rochester is significantly larger than Plainview, the record does not reflect whether there are smaller nearby cities with full-time fire departments to provide another possible base to determine Johnson's imputed wage. While we do not find error in the WCCA's decision to uphold the use of the Rochester salary, we caution that in future proceedings every effort should be made to locate cities which as closely as possible resemble the employer's in size and location in order to arrive at a fair estimation of an employee's imputed wage.

In assessing Johnson's compensation rate, the compensation judge arrived at a total weekly wage of $514.31, reflecting the combination of Johnson's imputed wage as a fireman of $371.60 plus his income of $142.71 as an employee of the Bob Johnson Sports Center. This finding was upheld by the WCCA. We reverse this portion of the WCCA's opinion.

■ Minn.Stat. § 176.011, subd. 3, allows a combination of an employee's earnings only when he has been *"regularly employed by two or more employers"* (emphasis added). In this case Johnson was not a "regular employee" of the Plainview Fire Department. As a volunteer who performed emergency services, Johnson does not qualify as an employee under this definition. He was not regularly employed by two or more employers and only the imputed wage should be used in calculating his "daily wage." The object of wage determination is to "arrive at a fair approximation of [the employee's] probable future earning power which has been impaired or destroyed because of the injury." *Bradley v. Vic's Welding,* 405 N.W.2d 243, 245–46 (Minn.1987). Allowing Johnson to add on the salary from his regular job to the imputed wage would unfairly exaggerate his lost income. We remand for a new calculation of Johnson's daily wage using only his imputed earnings as a firefighter.

## IV.

■ A claim against the Fund can only be paid if the decedent was a peace officer[1]

---

1. Neither party contests the fact that both John-     son and Hardel were peace officers under Minn.

"killed in the line of duty" whose death was not the result of "natural causes." Minn.Stat. § 352E.04 (Supp.1985). The deaths of Johnson and Hardel qualify under this standard and entitle their dependents to benefits under the Fund.

In *Kramer v. State, Peace Officers Benefit Fund,* 380 N.W.2d 497 (Minn.1986), we defined the phrase "killed in the line of duty" as "death resulting from the performance of those duties peculiar to a peace officer that expose the officer to the hazard of being killed." *Id.* at 501. In setting forth this definition, we recognized that the purpose of the Fund is to provide a "special lump sum award to spouses and dependent children of peace officers in recognition of the 'unusual risks [peace officers] face in their work.'" *Id.*

In the cases of Johnson and Hardel, at the time of their heart attacks both men were involved in firefighting duties which exposed them to the risk of being killed. Unlike the situation in *Kramer,* where Fund benefits were denied on the basis that the officer was performing administrative tasks in a city office building, Johnson and Hardel were actively involved in fighting fires and exposed to the physical and emotional stress involved in such a dangerous activity. Johnson died at the scene of the fire as a result of his heart attack, while Hardel died a few days later as a direct result of the heart attack he suffered at the fire.

The Fund argues that Johnson and Hardel do not qualify for benefits since their deaths were the result of "natural causes." Under the statute "killed in the line of duty does not include deaths from natural causes." Minn.Stat. § 352E.04 (Supp. 1985). This exclusionary language was added in 1984, without definition and with little explanation of its intent. It was part of an omnibus appropriations bill totaling $196,912,800 and consisting of 5 articles and 402 sections. Act of May 2, 1984, ch.

654, art. 2, sec. 126, 1984 Minn. Laws 1903, 1987. The provision found in article 2, sec. 126, was added in conference committee with little comment by the author or a staff person. No public testimony was taken and the legislative record does not indicate the circumstances that existed at the time the provision was included. At the same session, Ch. 454, Laws of 1984, was enacted, raising the $50,000 limit to $100,000 and, while public testimony was taken during its passage, there was no discussion regarding the phrase " 'killed in the line of duty' does not include deaths from natural causes or deaths that occur during employment for a private employer." Act of April 24, 1984, ch. 454, sec. 1, 1984 Minn. Laws 224. We have never defined the phrase "natural causes" and do not find it to be a term of art which is commonly defined.

The Fund argues the natural causes exclusion was a response to our decision in *Ondler v. Peace Officers Benefit Fund,* 289 N.W.2d 486 (Minn.1980), where we held that language excluding all heart attack deaths from coverage was unconstitutional under the equal protection clause since it failed to exclude deaths from respiratory failure, asthma attacks, strokes and other causes. According to the Fund the natural causes language was meant to exclude all deaths resulting from some preexisting disease process present in the peace officer's body at the time of death. Under this interpretation, only deaths caused solely by an external force would qualify under the statute. We do not find this intent manifested in the legislative history.[2]

■ Johnson and Hardel's deaths were not the result of natural causes. Although both men were suffering from atherosclerosis, neither was aware of this condition. In addition, expert testimony indicated that the physical and emotional stress associated with their firefighting activities was a contributing factor in the heart attacks

Stat. § 352E.01, subd. 2 (1985).

2. In addition to the lack of any clear legislative intent, counsel for the Fund orally argued before this court that an individual suffering from emphysema would still be covered under the Fund if his death resulted from smoke inhala-

tion suffered at a fire. This admission conflicts with the natural causes definition presented by the Fund which would exclude deaths resulting in part from the presence of a preexisting disease process.

each man suffered. Given that the Fund was established to recognize the sacrifices made by peace officers in performing hazardous work in protection of the public, any death which results in part from the performance of such work should qualify for Fund benefits.[3]

Since Johnson and Hardel were killed in the line of duty and their deaths were not the result of natural causes, the WCCA is affirmed on this issue.

AFFIRMED IN PART, REVERSED IN PART, AND REMANDED.

---

**3.** If the legislature did not intend this result, it is free to enact new clarifying legislation. *See Goodman v. State, Department of Public Safety,* 282 N.W.2d 559, 560 (Minn.1979). We urge the legislature to clearly define any future exclusionary language.