STATE OF MINNESOTA

IN SUPREME COURT

A24-1410

Court of Appeals                                                          McKeig, J.

In the Matter of a Public Safety Officer
Death Benefit for Eric William Groebner
(Deceased).                                                   Filed: June 3, 2026
                                                       Office of Appellate Courts

————————————————

Keith Ellison, Attorney General, Cory J. Marsolek, Assistant Attorney General, Saint Paul, Minnesota, for appellant/cross-respondent Commissioner of Public Safety.

Scott R. Rowland, Joshua Harrison, Meuser, Yackley & Rowland, P.A., Eden Prairie, Minnesota, for respondent/cross-appellant Holly Groebner.

Daniel R. Kelly, Brandon J. Wheeler, Alec R. Rolain, Felhaber Larson, Minneapolis, Minnesota for amicus curiae Legal Defense Fund of the Peace Officers Research Association of California.

————————————————

S Y L L A B U S

1.      A public safety officer who dies from a heart attack, stroke, or vascular rupture is presumed to have been "killed in the line of duty" if the death meets the presumption criteria under Minn. Stat. § 299A.41, subd. 3(a). For purposes of the presumption criteria under subdivision 3(a)(1)(i), an emergency response is presumptively "nonroutine" regardless of how the public safety agency characterizes the emergency response or whether the emergency response is frequently performed, and the phrase "nonroutine stressful or strenuous physical" modifies the entire series of items

1

following it: "law enforcement, fire suppression, rescue, hazardous material response, emergency medical services, prison security, disaster relief, or other emergency response activity."

2.      If the death does not satisfy the presumption criteria or if the Commissioner of Public Safety rebuts the presumption with competent medical evidence, the officer's estate can present its own medical evidence to show that the officer was "killed in the line of duty" under *Kramer v. State, Peace Officers Ben. Fund*, 380 N.W.2d 497 (Minn. 1986), and *Johnson v. City of Plainview*, 431 N.W.2d 109 (Minn. 1988).

Affirmed in part, reversed in part.

## O P I N I O N

MCKEIG, Justice.

In this case, we consider under what circumstances the estate of a public safety officer who dies from a heart attack, stroke, or vascular rupture is entitled to line-of-duty death benefits under Minn. Stat. §§ 299A.41–.47 (2022).[1] Minnesota Statutes section 299A.41, subdivision 3(a), states that a public safety officer who died from "a heart attack, stroke, or vascular rupture … shall be presumed to have died as the direct and proximate result of a personal injury sustained in the line of duty if" certain criteria are met. These criteria include circumstances where, in the 24 hours before the heart-related incident, the officer engaged in a situation or participated in a training exercise

---

[1]     Although various amendments to this statutory range have occurred since Groebner's death in September 2022, none of them are material to our analysis.

2

involving "nonroutine stressful or strenuous physical" activity. Minn. Stat. § 299A.41, subd. 3(a)(1)(i)–(ii). While the death benefits statute has existed since the 1970s, the Legislature added the presumption language for certain heart-related deaths in 2016. Act of June 1, 2016, ch. 189, art. 14, § 3, 2016 Minn. Laws 885, 1100 (2016 amendments).

Eric William Groebner, a patrol officer with the Anoka Police Department, worked a 12-hour shift in September 2022. The next day, he died from a vascular rupture. His widow, Holly Groebner (Ms. Groebner),[2] applied for line-of-duty death benefits under Minn. Stat. §§ 299A.41–.47. The Commissioner of Public Safety (the Commissioner) denied her application. Ms. Groebner appealed to the then-Office of Administrative Hearings.[3] The Administrative Law Judge (ALJ) granted the Commissioner's motion for summary disposition, finding that Groebner did not engage in nonroutine stressful or strenuous physical law enforcement activity during his last shift and thus, as a matter of law, his death was not a line-of-duty death under Minn. Stat. § 299A.41, subd. 3. The court of appeals reversed and remanded, determining that there remained a genuine issue of material fact as to whether Groebner engaged in nonroutine stressful or strenuous physical law enforcement or other emergency response activity during his last shift.

---

[2]     Throughout the opinion, we refer to the deceased officer as "Groebner" and, consistent with her brief, refer to his widow as "Ms. Groebner."

[3]     The Legislature changed the name of the adjudicating agency from the "Office of Administrative Hearings" to the "Court of Administrative Hearings" in 2025, after the Administrative Law Judge's order granting summary disposition in this case. Act of May 23, 2025, ch. 39, art. 2, § 68, 2025 Minn. Laws 1195, 1245.

The Commissioner petitioned for review as to the meaning of "nonroutine" under Minn. Stat. § 299A.41, subd. 3(a)(1)(i). Ms. Groebner conditionally cross-petitioned for review of whether, even if the presumption criteria are not met, the definition of "killed in the line of duty" that we articulated in *Kramer v. State, Peace Officers Ben. Fund*, 380 N.W.2d 497 (Minn. 1986), and *Johnson v. City of Plainview*, 431 N.W.2d 109 (Minn. 1988), remains good law after the Legislature added the presumption language in its 2016 amendments. We granted both petitions.

For reasons discussed below, we determine that "nonroutine" under Minn. Stat. § 299A.41, subd. 3(a)(1)(i), is ambiguous and, based upon the legislative history, we construe the term to have a meaning consistent with the federal death benefits statute. Accordingly, we hold that an emergency response is presumptively "nonroutine" under Minn. Stat. § 299A.41, subd. 3(a)(1)(i), regardless of how the public safety agency characterizes the emergency response or whether the emergency response is frequently performed. We also hold that the statutory phrase "nonroutine stressful or strenuous physical" modifies the entire series of items following it in Minn. Stat. § 299A.41, subd. 3(a)(1)(i), not just "law enforcement," such that any activity that satisfies the presumption must be "nonroutine stressful or strenuous physical." Applying this construction, we affirm on different grounds the court of appeals holding that there is a genuine issue of material fact as to whether Groebner engaged in nonroutine stressful or strenuous physical law enforcement or other emergency response activity during his last shift.

We also hold that the presumption of compensability for deaths from heart attack, stroke, or vascular rupture under the 2016 amendments did not replace the *Kramer* and

4

*Johnson* definition of "killed in the line of duty" for those deaths; if the death does not satisfy the presumption criteria or the Commissioner rebuts the presumption with competent medical evidence, the officer's estate can present its own medical evidence to show that the officer was "killed in the line of duty" under *Kramer* and *Johnson*. We reverse the court of appeals holding to the contrary.

**FACTS**

Groebner served as a patrol officer for the City of Anoka Police Department from February 2014 until his death in September 2022. On September 13, 2022, Groebner worked from 10:00 a.m. to 10:00 p.m. and responded to 11 calls. Based on the Anoka Police Department incident data, call summaries, and dash and body camera footage, we summarize the calls that Groebner responded to as follows:

1. **10:07–10:25 a.m. Burglary.** Groebner assisted a Ramsey Police Department search for a burglary suspect. Other officers arrested the suspect later that afternoon.
2. **10:25–10:27 a.m. Suspicious person.** Groebner responded to a call reporting that a person was possibly burning something in a gas station bathroom. The person left the gas station before officers arrived.
3. **11:33 a.m.–12:06 p.m. Warrant.** Groebner ran a driver's license inquiry for a warrant investigation.
4. **12:17–12:22 p.m. Traffic stop.** Groebner pulled over a driver for a malfunctioning brake light and turn signal. He did not issue a ticket.
5. **2:18–2:33 p.m. Trespassing.** Groebner responded to a call reporting that a man was trespassing and may attempt to break into a house. Groebner issued a warning.
6. **3:54–4:16 p.m. Traffic stop.** Groebner pulled a driver over for speeding in a school zone.[4]

---

[4] The Anoka Police Department's summary of Groebner's activities on September 13, 2022, states that Groebner issued a speeding ticket, but the body camera footage shows that Groebner issued a warning, not a ticket.

7. **4:18–4:20 p.m. Suspicious person.** Groebner and other officers were dispatched to a location where people were working on a car in the driveway of a home while the homeowners were out of town. When officers arrived, no one was there, and the residence was secure.

8. **4:20–4:26 p.m. Domestic.** Groebner responded to a phone report of a possible domestic dispute. The department called the reporting number, left a voicemail, and received no response.

9. **5:34–6:00 p.m. Domestic.** Groebner and another officer responded to a call reporting a child with a knife. Groebner drove to the scene through a residential neighborhood, reaching a top speed of 59 miles per hour. There was no evidence of a knife when Groebner arrived. Groebner spoke separately with the father and the son outside the residence. The son said his mother yelled at him for chasing his sister; the father said the son was not listening to him and was causing a scene. Groebner mediated the situation and both parties went back inside.

10. **6:03–6:09 p.m. Theft report.** Groebner was dispatched to a theft report, but the department was unable to reach the reporting party.

11. **6:54–7:00 p.m. Follow up.** Groebner tried to follow up with the reporting party.

Groebner returned home around 10:00 p.m. He woke up the next morning and put his two children on the bus around 8:45 a.m. He did not say anything to Ms. Groebner that morning about not feeling well. Ms. Groebner returned from work later that day and found Groebner on the floor of the basement bathroom. The medical examiner determined that the cause of Groebner's death was a "rupture of ascending aortic aneurysm with cardiac tamponade," and the manner of death was "natural."[5]

Ms. Groebner began receiving benefits from the Minnesota Public Employees Retirement Association in December 2022. She applied to the federal Public Safety Officers' Benefits Office for benefits under 34 U.S.C. § 10281, and she also applied to

---

[5] The parties agree that this rupture was a "vascular rupture." The ALJ and court of appeals also refer to this rupture as a "vascular rupture." *In re Groebner*, No. A24-1410, 2025 WL 1430594, at *1 (Minn. App. May 19, 2025). Thus, there is no dispute that Groebner died from a vascular rupture under Minn. Stat. § 299A.41, subd. 3(a).

the Commissioner for state benefits under Minn. Stat. §§ 299A.41–.47. Along with her application to the Minnesota Department of Public Safety, Ms. Groebner submitted, among other things, the autopsy report, the death certificate, Ms. Groebner's timeline of the 24 hours before finding Groebner, and a medical expert's report. In the report, the medical expert opined that "the intensely stressful nature of police work contributed to the development and aggravation of [Groebner's] anxiety and hypertension, both of which are causally related to the initiation and progression of aortic and cardiovascular disease." The expert did not address whether the specific activities Groebner engaged in during his last shift contributed to the vascular rupture.

Ms. Groebner's application for federal death benefits was approved but her application for Minnesota death benefits was not. In October 2023, the federal Public Safety Officers' Benefits Office determined that Groebner's death was covered by 34 U.S.C. § 10281 because Groebner "died as the direct and proximate result of a heart attack suffered not later than 24 hours after engaging in an on-duty situation involving nonroutine stressful physical emergency response activity." The following month, the Commissioner notified Ms. Groebner that Groebner was "not eligible for the Line of Duty Death Benefit" because he "did not die in the line of duty as a peace officer at the time of his death, as defined by Minn. Stat. § 299A.41, subd. 3."

Ms. Groebner appealed the Commissioner's decision to the Office of Administrative Hearings. The Commissioner moved for summary disposition, submitting exhibits including Anoka Police Department documents and body and dash camera video related to Groebner's last patrol shift. Along with her motion against summary

7

disposition, Ms. Groebner included a June 19, 2024 affidavit from Drew Moldenhauer, a Minnesota police officer with 17 years of experience. In his affidavit, Moldenhauer stated that the domestic disturbance call that Groebner responded to during his last shift "involved … nonroutine stressful or strenuous physical law enforcement or other emergency response activity."

The ALJ granted summary disposition.[6] The ALJ found that there was no genuine dispute of material fact and that Groebner's last shift did not consist of "nonroutine stressful or strenuous law enforcement activity" as a matter of law because, under our decisions in *Kramer* and *Johnson*, Groebner's performance of his duties did not "expose [him] to the hazard of being killed." *See Kramer*, 380 N.W.2d at 501 (defining "killed in the line of duty" as "death resulting from the performance of those duties peculiar to a peace officer that expose the officer to the hazard of being killed"); *Johnson*, 431 N.W.2d at 115 (defining "killed in the line of duty" as "any death which results in part from the performance of" "hazardous work in protection of the public").

Ms. Groebner appealed the ALJ's decision, and the court of appeals reversed and remanded. *In re Groebner*, No. A24-1410, 2025 WL 1430594 (Minn. App. May 19, 2025). The court of appeals held that the *Kramer* and *Johnson* definition of "killed in the line of duty" did not apply because those cases do not control "deaths specifically

---

[6] The ALJ first issued an order recommending that the Department of Public Safety grant summary disposition. The next day, the Office of Administrative Hearings issued a correction that the order "serve[d] as the binding and final decision in this matter" under Minn. Stat. § 299A.43.

included or excluded by the [L]egislature in Minn. Stat. § 299A.41, subd. 3," including deaths from vascular ruptures. *Id.* at *3 n.4 (citation omitted) (internal quotation marks omitted). The court also held that "nonroutine" means "not customary, mechanically performed, or part of the regular course of procedure." *Id.* at *5. Applying this interpretation, the court of appeals concluded that there remained a genuine issue of material fact as to whether the domestic disturbance call was nonroutine and stressful and held that the ALJ erred by granting summary disposition. *Id.* at *5–7.

One court of appeals judge dissented, concluding that "nonroutine" means "special or extraordinary." *Id.* at *9 (Johnson, J., dissenting). Applying this definition, the dissenting judge would have affirmed the ALJ, holding that there was no genuine issue of material fact as to whether Groebner's activity during his last shift was "nonroutine" under Minn. Stat. § 299A.41, subd. 3. *Id.* at *11.

**ANALYSIS**

The State of Minnesota provides a one-time death benefit to eligible family members or to the estate of a public safety officer who is killed in the line of duty. Minn. Stat. § 299A.44, subds. 1(a), 2 (providing $100,000 in benefits, adjusted over time based on changes to the Consumer Price Index). Minnesota Statutes section 299A.41, subdivision 3, of the public safety officer death benefits statute defines the phrase "killed in the line of duty." This provision excludes "deaths from natural causes" from line-of-duty deaths. *Id.* Before the 2016 amendments, subdivision 3 did not expressly address whether an officer who suffered a heart-related death could be considered "killed in the line of duty." Minn. Stat. § 299A.41, subd. 3 (2014). In the absence of statutory guidance,

9

we considered whether officers who suffered heart-related deaths were killed in the line of duty in two cases: *Kramer*, 380 N.W.2d 497, and *Johnson*, 431 N.W.2d 109. In those cases, we defined "killed in the line of duty" as "any death which results in part" "from the performance of those duties peculiar to a peace officer that expose the officer to the hazard of being killed." *Johnson*, 431 N.W.2d at 114–15 (quoting *Kramer*, 380 N.W.2d at 501) (internal quotation marks omitted).

In its 2016 amendments, the Legislature amended section 299A.41 to add a presumption that certain heart-related deaths are in the line of duty. Today, Minn. Stat. § 299A.41, subd. 3, defines "killed in the line of duty" in pertinent part as follows, with the language added and removed by the 2016 amendments demarcated:

> (a) "Killed in the line of duty" does not include deaths from natural causes, except as provided in this subdivision. In the case of a ~~peace~~ public safety officer, "killed in the line of duty" includes the death of ~~an~~ a public safety officer caused by accidental means while the ~~peace~~ public safety officer is acting in the course and scope of duties as a ~~peace~~ public safety officer. Killed in the line of duty also means if a public safety officer dies as the direct and proximate result of a heart attack, stroke, or vascular rupture, that officer shall be presumed to have died as the direct and proximate result of a personal injury sustained in the line of duty if:
> (1) that officer, while on duty:
>> (i) engaged in a situation, and that engagement involved nonroutine stressful or strenuous physical law enforcement, fire suppression, rescue, hazardous material response, emergency medical services, prison security, disaster relief, or other emergency response activity; or
>> (ii) participated in a training exercise, and that participation involved nonroutine stressful or strenuous physical activity;
> (2) that officer died as a result of a heart attack, stroke, or vascular rupture suffered: …
>> (iii) not later than 24 hours after engaging or participating under clause (1); and
> (3) the presumption is not overcome by competent medical evidence to the contrary.

10

Minn. Stat. § 299A.41, subd. 3(a); 2016 amendments.

The dispute in this case centers on whether Groebner was killed in the line of duty. The answer to that question requires us to interpret section 299A.41, subdivision 3(a). We first must determine the meaning of the statutory criteria that give rise to the presumption that the officer died as the direct and proximate result of a personal injury. In particular, we assess whether Groebner's death was "nonroutine" as that term is used in the statutory definition of "killed in the line of duty," and whether the phrase "nonroutine stressful or strenuous physical" modifies only "law enforcement" or the entire series of nouns that follow it in subdivision 3(a)(1)(i). Next, we address whether the 2016 amendments' presumption of compensability for certain heart-related deaths replaced the *Kramer* and *Johnson* definition of "killed in the line of duty" for those types of deaths or whether, in circumstances where the presumption does not apply or is rebutted, the standard from those decisions continues to apply. Statutory interpretation is a legal question that we review de novo. *Pietsch v. Minn. Bd. of Chiropractic Exam'rs*, 683 N.W.2d 303, 306 (Minn. 2004).

I.

The statutory presumption in Minn. Stat. § 299A.41, subd. 3, that the "officer shall be presumed to have died as the direct and proximate result of a personal injury sustained in the line of duty," applies if certain criteria are met. At issue here is the requirement in subdivision 3(a)(1)(i) that the officer, while on duty, "engaged in a situation, and that engagement involved nonroutine stressful or strenuous physical law enforcement, fire suppression, rescue, hazardous material response, emergency medical services, prison

11

security, disaster relief, or other emergency response activity." The parties dispute the meaning of the term "nonroutine" as well as the scope of what the phrase "nonroutine stressful or strenuous physical" modifies.

A.

First, we interpret the meaning of "nonroutine" in Minn. Stat. § 299A.41, subd. 3(a)(1)(i). We interpret statutes to "ascertain and effectuate the intention of the [L]egislature." Minn. Stat. § 645.16. "The plain language of the statute is our best guide to the Legislature's intent" and, "[i]f the statutory language is clear," we apply the plain meaning of the statute. *Rodriguez v. State Farm Mut. Auto. Ins. Co.*, 931 N.W.2d 632, 634 (Minn. 2019). If the statute "is reasonably susceptible to more than one interpretation" it is ambiguous, and we apply canons of construction to determine legislative intent. *In re Welfare of J.B.*, 782 N.W.2d 535, 539–40 (Minn. 2010) (citation omitted) (internal quotation marks omitted).

Ms. Groebner argues that "nonroutine" under Minn. Stat. § 299A.41, subd. 3(a)(1)(i), plainly means "not customary, mechanically performed, or part of an officer's regular course of procedure," as held by the court of appeals. *Groebner*, 2025 WL 1430594, at *5. The Commissioner argues that "nonroutine" means "special or extraordinary," as concluded by the court of appeals dissent. *Id.* at *9 (Johnson, J., dissenting). First, we consider whether the term "nonroutine" under Minn. Stat. § 299A.41, subd. 3(a)(1)(i), has a plain meaning or is ambiguous.

12

1.

To determine whether "nonroutine" is ambiguous, we look to its common, ordinary meaning. *See Getz v. Peace*, 934 N.W.2d 347, 354 (Minn. 2019); Minn. Stat. § 645.08(1). "[W]hen the Legislature has not provided definitions of the relevant term … we may consider dictionary definitions to determine a word's common usage." *Getz*, 934 N.W.2d at 354. The parties have not cited, and we have not identified, any physical dictionaries that define "nonroutine." *The American Heritage Dictionary* defines "non" as "[n]ot" and lists definitions for "routine" as both a noun and an adjective. 1198, 1529–30 (5th ed. 2018). Because "nonroutine" operates as an adjective in the statute, we consider definitions of "routine" as an adjective. They are: "1. In accord with established procedure: *a routine check of passports*. 2. Habitual; regular: *made his routine trip to the store*. 3. Having no special quality; ordinary: *a routine day*." *Id.* at 1529–30.

These dictionary definitions provide some support for both parties' interpretations of "nonroutine." The first and second dictionary definitions of "routine"—"[i]n accord with established procedure," "[h]abitual," and "regular"—support part of Ms. Groebner's interpretation that "nonroutine" means "not customary … or part of the regular course of procedure."[7] The second and third definitions of "routine" as "regular" and "[h]aving no

---

[7]    We note, however, that none of *The American Heritage Dictionary* definitions of "routine" as an adjective support the part of Ms. Groebner's interpretation that "nonroutine" means not "mechanically performed"—this derives from a dictionary definition of "routine" as a *noun*, which is inapplicable here. 1529 (5th ed. 2018) ("1a. A set of customary or unchanging and often mechanically performed activities or procedures: *a routine of housework*.").

13

special quality; ordinary" support the Commissioner's interpretation that "nonroutine" means "special or extraordinary."[8]

Because the meaning of "nonroutine," as used in Minn. Stat. § 299A.41, subd. 3(a)(1)(i), is "reasonably susceptible to more than one interpretation," it is ambiguous.[9] *See Welfare of J.B.*, 782 N.W.2d at 540.

2.

When a statute is ambiguous, we may consider canons of construction to ascertain the Legislature's intent, including the circumstances under which the statute was enacted and the statute's "contemporaneous legislative history." *Scheurer v. Shrewsbury*, 24 N.W.3d 670, 678 (Minn. 2025); Minn. Stat. § 645.16(2), (7). We have also generally held that "[w]here the state statute is the same or substantially the same as the federal act from which it was copied, the prior construction of the federal statute should be deemed controlling by us in construing the state statute." *State v. Stickney*, 5 N.W.2d 351, 352 (Minn. 1942); *Minn. Citizens Concerned for Life, Inc. v. Kelley*, 698 N.W.2d 424, 429 (Minn. 2005).

---

[8]    The online dictionary definitions of "nonroutine" noted by the court of appeals likewise provide some support for both parties' interpretations. The online Merriam-Webster Dictionary was cited as defining "nonroutine" as including "not of a commonplace or repetitious character," which supports Ms. Groebner's interpretation, while the online Cambridge Dictionary defined "non-routine" as "special or unusual, rather than part of what usually happens," which supports the Commissioner's interpretation. *See Groebner*, 2025 WL 1430594, at *5 n.5.

[9]    While we can sometimes discern from statutory context which of multiple possible dictionary definitions apply, that is not the case here. *Cf. State v. Johnson*, 995 N.W.2d 155, 160–61 (Minn. 2023).

In 2016, the federal death benefits statute contained the following presumption that certain heart-related deaths are line-of-duty deaths:

> **(k) Death by heart attack, stroke, or vascular rupture; presumption**
> As determined by the bureau, a heart attack, stroke, or vascular rupture suffered by a public safety officer shall be presumed to constitute a personal injury … sustained in the line of duty by the officer and directly and proximately resulting in death, if--
> (1) the public safety officer, while on duty--
>> (A) engages in a situation involving nonroutine stressful or strenuous physical law enforcement, fire suppression, rescue, hazardous material response, emergency medical services, prison security, disaster relief, or other emergency response activity; or
>> (B) participates in a training exercise involving nonroutine stressful or strenuous physical activity;
> (2) the heart attack, stroke, or vascular rupture commences ….
>> (C) not later than 24 hours after the officer is engaged or participating as described in paragraph (1); and
> (3) the heart attack, stroke, or vascular rupture directly and proximately results in the death of the public safety officer, unless competent medical evidence establishes that the heart attack, stroke, or vascular rupture was unrelated to the engagement or participation or was directly and proximately caused by something other than the mere presence of cardiovascular-disease risk factors.
>
> **(*l*) Definition**
> For purposes of subsection (k) of this section, "nonroutine stressful or strenuous physical" excludes actions of a clerical, administrative, or nonmanual nature.

42 U.S.C. § 3796(k)–(*l*) (2016) (transferred to 34 U.S.C. § 10281 as of September 2017).

These provisions of the federal death benefits statute have remained substantially the same since 2016. *See* 34 U.S.C. § 10281(k)–(*l*). Minnesota Statutes section 299A.41, subdivision 3(a)(1), is substantially similar—indeed, at points identical—to this federal statute. The close overlap in language and purpose is a strong signal that the Minnesota Legislature intended the Minnesota Statutes to reflect the federal law.

15

The legislative history of Minn. Stat. § 299A.41, subd. 3, confirms that the Legislature intended the 2016 amendments to bring the Minnesota death benefits statute into "conformity" with the heart-related deaths presumption in the federal public safety officers' benefits statute, 42 U.S.C. § 3796(k) (2016). Hearing on H.F. 2810, H. Comm. Pub. Safety & Crime Prevention Pol'y & Fin., 89th Minn. Leg., Mar. 22, 2016 (video tape) (statement of Jeff Howe). The goal of the 2016 amendments, as articulated by the bill's sponsor, Representative Howe, was to give grieving families a "one-stop shop" at the Department of Public Safety, such that the Commissioner's determination that the officer was "killed in the line of duty" would satisfy both the state and federal death benefits statutes. *Id.* As sponsor, Representative Howe's description of the bill's purpose or effect "is entitled to some weight in construing the statute." *See Scheurer*, 24 N.W.3d at 678 (citation modified). His statements are also corroborated by the house summary of the bill: "This bill conforms Minnesota's definition of 'killed in the line of duty' with the definition found in the federal Hometown Heroes Act for purposes of awarding benefits to the survivors of public safety officers who are killed in the line of duty."[10] *H. Res. Bill Summary: H.F. 2810* (Mar. 22, 2016). Because the Legislature enacted statutory text very similar to the existing federal death benefits statute and the purpose of the 2016 amendments was to align the state and federal public safety benefit schemes, we look to the federal death benefits statute, its implementing regulations, and relevant agency

---

[10]     "Hometown Heroes Act" is the name of the legislation amending the federal death benefits statute to include the heart-related deaths presumption. Hometown Heroes Survivors Benefits Act of 2003, Pub. L. No. 108–182, 117 Stat. 2649 (2003).

16

memoranda for insight into the meaning of "nonroutine" under Minn. Stat. § 299A.41, subd. 3(a)(1)(i). *See Stickney*, 5 N.W.2d at 352; *Great N. Invs., Inc. v. Comm'r of Tax'n*, 127 N.W.2d 444, 449 (Minn. 1964); *Shrewsbury*, 24 N.W.3d at 678.

While the federal statute does not define "nonroutine" and only defines "nonroutine stressful or strenuous physical" insofar as it "excludes actions of a clerical, administrative, or nonmanual nature," the statute's implementing regulations, also in effect in 2016, do offer definitions:

> *Nonroutine stressful or strenuous physical activity* means nonroutine stressful physical activity or nonroutine strenuous physical activity.
>
> *Nonroutine strenuous physical activity* means line of duty activity that—
> (1) Is not excluded by the Act, at 34 U.S.C. 10281(*l*);
> (2) Is not performed as a matter of routine; and
> (3) Entails an unusually-high level of physical exertion.
>
> *Nonroutine stressful physical activity* means line of duty activity that—
> (1) Is not excluded by the Act, at 34 U.S.C. 10281(*l*);
> (2) Is not performed as a matter of routine;
> (3) Entails non-negligible physical exertion; and
> (4) Occurs—
> > (i) With respect to a situation in which a public safety officer is engaged, under circumstances that objectively and reasonably—
> > > (A) Pose (or appear to pose) significant dangers, threats, or hazards (or reasonably-foreseeable risks thereof), not faced by similarly-situated members of the public in the ordinary course; and
> > > (B) Provoke, cause, or occasion an unusually-high level of alarm, fear, or anxiety; or
> > (ii) With respect to a training exercise in which a public safety officer participates, under circumstances that objectively and reasonably—
> > > (A) Simulate in realistic fashion situations that pose significant dangers, threats, or hazards; and
> > > (B) Provoke, cause, or occasion an unusually-high level of alarm, fear, or anxiety.

17

*Routine*—Neither of the following shall be dispositive in determining whether an activity or action shall be understood to have been performed as a matter of routine:

> (1) Being generally described by the public safety agency as routine or ordinary; or
> (2) The frequency with which it may be performed.[11]

28 C.F.R. § 32.13. These definitions apply to "nonroutine stressful or strenuous physical" under 34 U.S.C. § 10281(k)(1)(A)–(B).

While the federal regulations do not expressly define "nonroutine," the definitions of both "[n]onroutine strenuous physical activity" and "[n]onroutine stressful physical activity" reflect that under federal law, nonroutine means "not performed as a matter of routine." Second, the definition of "[r]outine" tells us what the Bureau of Justice Assistance (BJA)—which plays a similar role to the Commissioner in awarding line-of-duty death benefits—may not consider dispositive when determining whether an activity is nonroutine: the relevant public safety agency's description of the activity or the frequency with which the activity may be performed.

An October 2007 BJA memorandum also addresses the subject.[12] *See In re Issuance of Air Emissions Permit No. 13700345-101 for PolyMet Mining, Inc., City of*

---

[11] In 2016, before the federal death benefits statute was transferred to 34 U.S.C. § 10281, the definitions of "[n]onroutine strenuous physical activity" and "[n]onroutine stressful physical activity" referred to 42 U.S.C. § 3796(*l*). 28 C.F.R. § 32.13 (2016).

[12] We also reviewed the two federal appellate cases providing illustrative examples of "nonroutine" under 34 U.S.C. § 10281. In *Watkins v. Department of Justices*, a public safety officer passed out while on break "from performing traffic and crowd control at graduation ceremonies" and remained unconscious until he died two weeks later. 809 Fed. Appx. 923, 924 (Fed. Cir. 2020). The Federal Circuit affirmed the finding of the BJA that performance of "traffic and crowd control at graduation ceremonies" amounted to "routine patrol activities" and "did not involve nonroutine or strenuous physical law

18

*Hoyt Lakes, St. Louis Cnty., Minn.*, 955 N.W.2d 258, 266 (Minn. 2021) (observing that a federal agency's informal interpretation of a federal statute may be given persuasive weight). In October 2007, the BJA issued a memorandum establishing a "policy and practice of the Public Safety Officers' Benefits Program" when determining whether an activity is "nonroutine stressful or strenuous physical." Memorandum from the Office of the Director for the Bureau of Justice Assistance on Public Safety Officers' Benefits Program Policy Memorandum re: "Nonroutine stressful or strenuous physical activity" (Oct. 2, 2007) (October 2007 Memo). The memo provided that no activity should be considered routine based only on the public safety agency's description of the activity. *Id.* The memo also stated that whether an activity is nonroutine "should be informed less by the frequency with which it may be performed than by its stressful or strenuous character." *Id.* These concepts were later incorporated into the regulations' definition of "routine," added after the October 2007 Memo. 28 C.F.R. § 32.13; *see* 28 C.F.R. § 32.13 (2006) (defining "[n]onroutine strenuous physical activity," "[n]onroutine stressful or

---

enforcement activity" under 34 U.S.C. § 10281(k) "and its implementing regulations." *Watkins*, 809 Fed. Appx. at 924–26.

In *Afolayan v. Department of Justice*, a public safety officer completed a training run in 88-degree weather at 3,400 feet above sea level, collapsed, and died a day later. No. 2021-1452, 2022 WL 1124965, at *1 (Fed. Cir. Apr. 15, 2022). In its discussion of evaluating "cognizable 'injury,' " the Federal Circuit noted that the heart-related deaths presumption "explicitly excluded situations involving routine activities, even if they were stressful or strenuous; 'nonroutine' activity was required." *Id.* at *2–4. The court continued that "[t]he regulation [28 C.F.R. § 32.3], read in light of its history and the statute as a whole, requires a finding of nonroutine or out-of-the-ordinary climatic conditions for compensation." *Id.* at *4.

strenuous physical activity," and "[n]onroutine stressful physical activity," but not "routine").

The memo further explains that domestic disturbance calls, traffic stops, and fire alarms, though frequently occurring, usually "occasion considerable stress" in part because they involve many "serious unknowns." October 2007 Memo. The memo concludes: "Responding to an emergency call shall presumptively be treated as non-routine." *Id.* In a senate hearing two days after the memo's publication, the BJA Director characterized the memo as "provid[ing] binding direction so that no activity will be considered routine simply because the officer might engage in it regularly" and "that emergency calls will be considered non-routine." *Justice Denied: Implementation of the Hometown Heroes Survivors Benefits Act: Hearing Before the S. Comm. on the Judiciary*, 110th Cong. 13 (2007) (statement of Domingo S. Herraiz, Director, BJA, Office of Justice Program, Department of Justice).[13]

We find the federal statute, its corresponding regulations, and the October 2007 Memo informative and persuasive as to the interpretation of "nonroutine" in Minn. Stat. § 299A.41, subd. 3(a)(1)(i). The Minnesota Legislature intended to conform the state death benefits statute with its federal counterpart. The federal statute, as well as its corresponding regulations, are substantively the same now as they were when the

---

[13] At this hearing, the committee expressed concern that the BJA was not granting benefits to deserving survivors and taking too long to process survivors' benefits claims, and the BJA Director presented the October 2007 Memo as reducing ambiguity of the term "nonroutine" to help solve these problems. *Justice Denied*, 110th Cong. 1–13.

Minnesota Legislature added the statutory presumption to Minn. Stat. § 299A.41 in 2016. And the October 2007 Memo—whose concepts were incorporated into the regulations—controls how the BJA determines whether an officer engaged in "nonroutine stressful or strenuous physical" activity.

Having considered the text of Minn. Stat. § 299A.41, subd. 3(a)(1)(i), and the federal authorities with which the Minnesota Legislature intended to bring the statute in conformity, we hold that an emergency response is presumptively "nonroutine" under the statute, regardless of how the public safety agency characterizes the emergency response or whether the emergency response is frequently performed. We further observe that, consistent the Minnesota Legislature's intent for conformity with federal law, these same authorities likewise inform the presumption's "nonroutine stressful or strenuous physical" requirement in Minn. Stat. § 299A.41, subd. 3(a)(1)(i).[14] However, we caution that a determination of federal benefits in any particular case does not bind the Commissioner's determination of state benefits in that case.

---

[14] We need not decide here the weight the federal authorities are to be given if the federal statute or regulations had been substantively amended since the Minnesota Legislature's inclusion of the statutory presumption, nor the federal authorities' weight if the Commissioner promulgated its own rules on the issue. Here, the federal statute and corresponding federal regulations have not been substantively amended since the Minnesota Legislature added the statutory presumption in 2016. Nor has the Commissioner exercised his authority to "adopt rules under chapter 14 to implement, coordinate, and administer section[] 299A.41 …." Minn. Stat. § 299A.46.

B.

We next consider whether the phrase "nonroutine stressful or strenuous physical" in Minn. Stat. § 299A.41, subd. 3(a)(1)(i), modifies only "law enforcement" or the entire series that follows it: "law enforcement, fire suppression, rescue, hazardous material response, emergency medical services, prison security, disaster relief, or other emergency response activity." Ms. Groebner argues that the phrase modifies only "law enforcement" such that, so long as Groebner engaged in "emergency response activity" during his last shift, his death fulfills the presumption regardless of whether that activity was "nonroutine stressful or strenuous physical." The Commissioner argues that the phrase modifies the entire series of nouns that follows it, such that any activity that satisfies the presumption must be "nonroutine stressful or strenuous physical."

We interpret statutory "words and phrases … according to rules of grammar and according to their most natural and obvious usage unless it would be inconsistent with the manifest intent of the legislature." *ILHC of Eagan, LLC v. County of Dakota*, 693 N.W.2d 412, 419 (Minn. 2005); Minn. Stat. § 645.08(1). The "series qualifier rule of grammar … states that '[w]hen there is a straightforward, parallel construction that involves all nouns or verbs in a series, a … [qualifier] normally applies to the entire series.' " *State v. Khalil*, 956 N.W.2d 627, 634 (Minn. 2021) (quoting Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 147 (2012)); *see also State v. Stay*, 935 N.W.2d 428, 432 (Minn. 2019).

We apply the series qualifier rule when "[t]he sentence is structured as an easily digestible series of similar nouns," and the qualifier sensibly and easily applies to each

22

noun. *Khalil*, 956 N.W.2d at 634–35 (holding the series qualifier rule applied and that "administered to that person without the person's agreement" modified every noun in "alcohol, a narcotic, anesthetic, or any other substance"); *Stay*, 935 N.W.2d at 432 (holding the series qualifier rule did not apply because the allegedly-modified clauses were "not parallel" and did "not form an easy, digestible list"). Here, Minn. Stat. § 299A.41, subd. 3(a)(1)(i), contains a very simple and straightforward, easily digestible list of parallel and similar nouns: "law enforcement, fire suppression, rescue, hazardous material response, emergency medical services, prison security, disaster relief, or other emergency response activity." *See Khalil*, 956 N.W.2d at 634. The phrase "nonroutine stressful or strenuous physical" sensibly applies to each item listed. *Id.* Thus, the series qualifier rule applies to Minn. Stat. § 299A.41, subd. 3(a)(1)(i).[15]

---

[15] Rather than argue against applying the series qualifier grammar rule, Ms. Groebner argues that other provisions in the statute support her position. We "read a particular provision in context with other provisions of the same statute in order to determine the meaning of the particular provision." *State v. Riggs*, 865 N.W.2d 679, 683 (Minn. 2015). Ms. Groebner argues that, had the Legislature intended for "nonroutine stressful or strenuous physical" to modify every noun in the series, it would have put a colon after the modifying phrase as it did in subdivision 3(a)(2).

The Commissioner counters by comparing subdivision 3(a)(1)(i) with subdivision 3(a)(1)(ii). *See* Minn. Stat. § 299A.41, subd. 3(a)(1)(ii) (stating an officer can qualify for the heart-related deaths presumption by "participat[ing] in a training exercise, [where] that participation involved nonroutine stressful or strenuous physical activity"). Any qualifying training exercise, which could involve any of the activities listed in subdivision 3(a)(1)(i), must involve "nonroutine stressful or strenuous physical activity." The Commissioner argues it logically follows that "nonroutine stressful or strenuous physical" also modifies all activities listed in subdivision 3(a)(2)(i). We find the Commissioner's argument persuasive. The context of the statute shows that the Legislature intended for an officer's heart-related death to meet the presumption if they engaged in "nonroutine stressful or strenuous physical" activity, whether it was an activity listed in subdivision 3(a)(1)(i) or a training exercise in subdivision 3(a)(1)(ii).

23

We hold that "nonroutine stressful or strenuous physical" in Minn. Stat. § 299A.41, subd. 3(a)(1)(i), unambiguously modifies the entire series of activities that follow it. Accordingly, any activity that satisfies the presumption under Minn. Stat. § 299A.41, subd. 3(a)(1)(i), must be "nonroutine stressful or strenuous physical."

C.

Now that we have construed "nonroutine" and "nonroutine stressful or strenuous physical," we next determine whether, as a matter of law, Groebner's death was not entitled to the presumption that he was "killed in the line of duty" under Minn. Stat. § 299A.41, subd. 3. "Summary disposition is the administrative equivalent of summary judgment." *Pietsch*, 683 N.W.2d at 306. Like summary judgment, we review summary disposition to determine whether there are any genuine issues of material fact and whether there was an error in applying the law to the facts. *Id.* In doing so, we consider the evidence in the "light most favorable to the nonmoving party." *Henson v. Uptown Drink, LLC*, 922 N.W.2d 185, 190 (Minn. 2019) (citation omitted) (internal quotation marks omitted).

The parties dispute whether Groebner's death was entitled to the presumption that he was "killed in the line of duty" under Minn. Stat. § 299A.41, subd. 3, as a matter of law, each using their preferred definition of "nonroutine." The Commissioner argues that Groebner's death did not meet the presumption criteria as a matter of law and asks us to reverse the court of appeals and reinstate the ALJ's summary disposition order. Ms. Groebner contends that Groebner's death met the presumption criteria or, alternatively, that there is a genuine issue of material fact as to whether he met the

24

criteria, and that we should affirm the court of appeals. The parties agree that Groebner died from a vascular rupture within 24 hours of his final shift, and they seem to agree that Groebner's activities during his shift were not "strenuous." They dispute whether his shift involved nonroutine stressful physical law enforcement or other emergency response activity under Minn. Stat. § 299A.41, subd. 3(a)(1)(i).

For Groebner's death to meet the presumption criteria under Minn. Stat. § 299A.41, subd. 3, Ms. Groebner must show that, during Groebner's shift on September 13, 2022, he engaged in a situation involving nonroutine stressful or strenuous physical law enforcement or other emergency response activity. Ms. Groebner can show that Groebner presumptively engaged in "nonroutine" activity by showing that he responded to an emergency call. She must also show that the activity was "stressful physical" activity, which, as informed by corresponding federal authorities, may be met if the activity "entail[ed] non-negligible physical exertion"; occurred "under circumstances that objectively and reasonably … [p]ose (or appear to pose) significant dangers, threats, or hazards (or reasonably-foreseeable risks thereof), not faced by similarly-situated members of the public in the ordinary course"; and "provoke[d], cause[d], or occasion[ed] an unusually-high level of alarm, fear, or anxiety." *See* 28 C.F.R. § 32.13.

Reviewing the facts in the light most favorable to Ms. Groebner, we hold that there is a genuine issue of material fact as to whether Groebner engaged in a situation involving nonroutine stressful or strenuous physical law enforcement or other emergency response activity during his final shift. Groebner responded to several emergency calls during his shift, thus engaging in presumptively nonroutine law enforcement and

25

emergency response activity. That activity may have involved non-negligible physical exertion and occurred under circumstances that posed or appeared to pose significant danger and that provoked unusually high levels of alarm, fear, or anxiety in Groebner. Because there remains a genuine issue of material fact, the ALJ erred by granting summary disposition. *See Pietsch*, 683 N.W.2d at 306. We therefore affirm the court of appeals holding—though using a different interpretation of "nonroutine"—that there is a genuine issue of material fact as to whether Groebner engaged in a situation involving nonroutine stressful or strenuous physical law enforcement or other emergency response activity during his final shift.

## II.

We next turn to the question of whether, if Groebner's death does not meet the presumption criteria under Minn. Stat. § 299A.41, subd. 3, Ms. Groebner may still prove that he was "killed in the line of duty" under *Kramer* and *Johnson*, or whether the 2016 amendments' presumption of compensability for certain heart-related deaths replaced the *Kramer* and *Johnson* definition of "killed in the line of duty" for those types of deaths. To answer this, we first review the facts and holdings of *Kramer* and *Johnson* and then determine how the heart-related deaths presumption operates under Minn. Stat. § 299A.41, subd. 3.

## A.

When we decided *Kramer* and *Johnson* in the 1980s, the Legislature had not defined "killed in the line of duty" in the death benefits statute, other than to exclude "deaths from natural causes" and "deaths that occur during employment for a private

26

employer." Minn. Stat. § 352E.04 (1984).[16] In *Kramer* and *Johnson*, we considered whether the deceased officers' heart-related deaths were "from natural causes" or should be considered line-of-duty deaths.

In *Kramer*, a peace officer had a heart attack when he slipped walking down stairs in the St. Paul Safety Building. 380 N.W.2d at 498. He suffered two more heart attacks over the next 4½ years, the last resulting in his death. *Id.* at 498–99. His widow petitioned for benefits under the death benefits statute using the theory that the last heart attack, which occurred after the officer retired, was related to the first. *Id.* at 499. We noted the purpose of the death benefits statute: "to provide a special lump sum award to spouses and dependent children of peace officers in recognition of the unusual risks peace officers face in their work" and "of a peace officer's supreme sacrifice while performing hazardous work in protection of the public." *Id.* at 501 (citation modified). With the statute's purpose in mind, we interpreted "killed in the line of duty" to mean "death resulting from the performance of those duties peculiar to a peace officer that expose the officer to the hazard of being killed." *Id.* We held that, although the officer was on duty when he had the first heart attack, he was "engaged in the ordinary activity of administrative office routine" and not "in a duty peculiar to peace officers that exposed

---

[16] The statute was enacted as Minn. Stat. § 352E.04 (1973). Act of May 15, 1973, ch. 248, §§ 1–5, 1973 Minn. Laws 488, 489–91. The Legislature added " 'Killed in the line of duty' does not include deaths from natural causes or deaths that occur during employment for a private employer" in 1984. Act of May 2, 1984, ch. 654, art. 2, § 126, 1984 Minn. Laws 1903, 1988. The Legislature recodified the statute to Minn. Stat. § 299A.41 in 1990. Act of May 4, 1990, ch. 591, art. 5, § 1, 1990 Minn. Laws 2291, 2311–12.

him to the hazard of being killed," and so his survivors were not entitled to the death benefits. *Id.* at 502.

We reiterated and clarified this definition of "killed in the line of duty" in *Johnson*, 431 N.W.2d 109. We consolidated appeals related to two firemen who suffered fatal heart-related incidents while fighting fires. *Id.* at 111–12. One fireman had an "acute rupture of an aneurysm of his ascending aorta" while "attaching a 55-pound hose" to the bottom of a 1,000-gallon portable drop tank and was pronounced dead upon arriving at the hospital. *Id.* The other fireman suffered a heart attack while attempting to neutralize downed electrical wires, left the hospital a week later, suffered another attack later that day, and died a few days later. *Id.* at 112. Experts testified that the emotional and physical stress in fighting the fires contributed to both firemen's deaths: one "died at the scene of the fire as a result of his heart attack, while [the other] died a few days later as a direct result of the heart attack he suffered at the fire."[17] *Id.* at 112, 114.

We concluded that, unlike the officer in *Kramer* who suffered a heart attack while "performing administrative tasks," the firemen "were involved in firefighting duties which exposed them to the risk of being killed" "at the time of their heart attacks." *Id.* at 114. We rejected the argument that the firemen's deaths resulted from "natural causes" under the death benefits statute. *Id.* at 114–15. We explained that "[w]e have never

---

[17]    Despite initially stating that the first fireman suffered "an acute rupture of an aneurysm of his ascending aorta," *Johnson* later categorized both firemen as suffering from "heart attacks." 431 N.W.2d at 112, 114. Whether the fireman died from a vascular rupture or a heart attack is irrelevant to the operation of the death benefits statute.

defined the phrase 'natural causes' and do not find it to be a term of art which is commonly defined," and "any death which results in part from the performance of [hazardous work in protection of the public] should qualify" for the death benefits.[18] *Id.* Thus, we held that the firemen's "deaths were not the result of natural causes," they "were killed in the line of duty," and their survivors were entitled to the death benefits. *Id.*

Today, we emphasize that an officer is "killed in the line of duty" under *Kramer* and *Johnson* when the officer's death results in part from a specific instance of performing hazardous work—*not* from the long-term stress of public safety work. In *Kramer*, we characterized the death benefit as a payment made "in recognition of a peace officer's supreme sacrifice *while* performing hazardous work in protection of the public." 380 N.W.2d at 501 (emphasis added). In *Johnson*, we concluded that the firemen died in the line of duty because "at the time of their heart attacks both men were involved in firefighting duties which exposed them to the risk of being killed." 431 N.W.2d at 114. Thus, an officer is "killed in the line of duty" under *Kramer* and *Johnson* if the officer's death results in part from a specific instance of performing duties peculiar to a public

---

[18]    We noted in *Johnson* that "[i]f the [L]egislature did not intend this result, it is free to enact new clarifying legislation …. clearly defin[ing] any future exclusionary language." 431 N.W.2d at 115 n.3. The Commissioner argues that the Legislature enacted the 2016 amendments in direct response to this footnote. Because the amendments were enacted almost 30 years after we decided *Johnson* and none of the amendments' legislative history mentions *Johnson*, this argument is unpersuasive.

safety officer that exposes the officer to the hazard of being killed. *Kramer*, 380 N.W.2d at 501; *Johnson*, 431 N.W.2d at 114–15.

B.

The question remains whether the Legislature replaced the *Kramer* and *Johnson* definition of "killed in the line of duty" for certain heart-related deaths by passing the 2016 amendments. To answer this question, we interpret Minn. Stat. § 299A.41, subd. 3, to determine whether *Kramer* and *Johnson* still have a role to play within the current statute's heart-related deaths presumption framework.

The Commissioner and Ms. Groebner agree that the statute sets up a burden-shifting framework where (1) the deceased officer's estate has the burden to show that the officer's heart-related death meets the presumption criteria and, if the estate does so, (2) the Commissioner has the burden to rebut that presumption with competent medical evidence. The parties also agree that if the estate shows that the officer's death meets the presumption criteria and if the Commissioner either chooses not to present medical evidence to the contrary or that evidence is insufficient to rebut the presumption, then the officer was killed in the line of duty. The parties dispute how the statute operates when the officer's estate either cannot satisfy the presumption criteria or the Commissioner successfully rebuts the presumption. The Commissioner argues that the inquiry ends, and the officer was not "killed in the line of duty"; Ms. Groebner argues that the claimant can still prove that the officer was "killed in the line of duty" under *Kramer* and *Johnson*.

To determine how the statute operates when the officer's estate either cannot satisfy the presumption criteria or the Commissioner successfully rebuts the presumption,

30

we again interpret Minn. Stat. § 299A.41, subd. 3. We focus on the statute's

"presumption," cognizant that we interpret "technical words and phrases and such others

as have acquired a special meaning … according to such special meaning or their

definition." Minn. Stat. § 645.08(1). A legal word or phrase acquires a "special, technical

meaning" when "courts have ascribed a well-established and long-accepted meaning to

[the word or phrase]." *Cox v. Mid-Minn. Mut. Ins. Co.*, 909 N.W.2d 540, 543–44 (Minn.

2018) (citations omitted) (internal quotation marks omitted) (holding "[i]n the context of

commencing a civil action, the word 'delivery' has a special meaning" and citing *Black's*

*Law Dictionary*'s definition to determine the "accepted legal meaning of 'delivery' ").

Here, *Black's Law Dictionary*'s definition of "presumption" describes a burden-shifting

framework but does not explain what happens if the presumption criteria are not met or

the presumption is rebutted.[19] *Presumption*, *Black's Law Dictionary* (11th ed. 2019).

Looking at our "well-established and long-accepted meaning" of "presumption"

proves more helpful to our analysis. *Cox*, 909 N.W.2d at 543 (citation omitted) (internal

quotation marks omitted). Although we have never interpreted the presumption or

burden-shifting framework in Minn. Stat. § 299A.41, subd. 3, we have analyzed and

---

[19]   A legal inference or assumption that a fact exists because of the known or proven existence of some other fact or group of facts. Most presumptions are rules of evidence calling for a certain result in a given case unless the adversely affected party overcomes it with other evidence. A presumption shifts the burden of production or persuasion to the opposing party, who can then attempt to overcome the presumption.

*Presumption*, *Black's Law Dictionary* (11th ed. 2019).

31

applied presumptions and burden-shifting analyses in at least two other contexts: statutory presumptions in workers' compensation claims and *McDonnell Douglas* burden-shifting in employment discrimination claims. *See, e.g.*, *Juntunen v. Carlton County*, 982 N.W.2d 729, 741 (Minn. 2022); *Hanson v. Dep't of Nat. Res.*, 972 N.W.2d 362, 373 (Minn. 2022). In both contexts, the claimant can prove its case even if the presumption does not apply or is rebutted by the opposing party. In *Juntunen*, we contemplated circumstances where an employee may maintain a claim for workers' compensation benefits, even when the statutory presumption that the employee suffers from an occupational disease does not apply to the claim or that presumption is rebutted. 982 N.W.2d at 741 (noting that "the employer faces a higher burden than in a case in which no presumption applies" under the relevant statute and that, if the presumption is "rebutted by the employer, the presumption disappears" (citation modified)). In *Hanson*, an employment discrimination case, we noted that if the employer rebuts the presumption of discrimination by offering a legitimate, nondiscriminatory reason for the adverse employment action, the burden shifts back to the employee to show the employer's proffered reason is pretextual or improper. 972 N.W.2d at 373. That the claimant can prove its case even if the presumption does not apply in both those burden-shifting scenarios indicates that presumptions operate this way in general. In fact, neither we nor the parties have identified any case where a successful rebuttal leaves the claimant with no path forward.

Accordingly, the technical legal meaning of "presumption" includes a burden-shifting framework where, if the presumption does not apply or is rebutted, the party

32

bringing the claim can still prove its case without the benefit of the presumption. The technical meaning of "presumption" thus supports Ms. Groebner's interpretation that, if she is unable to show that Groebner's death satisfies the presumption criteria, or if the Commissioner successfully rebuts the presumption with competent medical evidence, she can still prove that Groebner was "killed in the line of duty" under *Kramer* and *Johnson*.

The Commissioner argues, however, that reading the presumption language in context with the whole statute supports its interpretation that a heart-related death can only be a line-of-duty death if it satisfies the presumption criteria and the Commissioner does not rebut the presumption with competent medical evidence. We read and construe statutes "as a whole so as to harmonize and give effect to all its parts." *Riggs*, 865 N.W.2d at 683 (citation omitted) (internal quotation marks omitted).

The 2016 amendments to Minn. Stat. § 299A.41, subd. 3, added both the "except as provided in this subdivision" exception to the statute's general exclusion of deaths from natural causes and the heart-related deaths presumption. The Commissioner argues that, in doing so, the Legislature designated "heart attack, stroke, [and] vascular rupture" as natural-cause deaths that can *only* be line-of-duty deaths if they satisfy the presumption criteria. The Commissioner asserts that designating these types of deaths as categorically natural-cause deaths contradicted *Kramer* and *Johnson*'s holdings that any death, including heart-related ones, are line-of-duty deaths and *not* natural-cause deaths if they result in part from "the performance of those duties peculiar to a peace officer that expose the officer to the hazard of being killed." *Johnson*, 431 N.W.2d at 114 (quoting *Kramer*, 380 N.W.2d at 501) (internal quotation marks omitted). Therefore, the

33

Commissioner argues, the 2016 amendments superseded *Kramer* and *Johnson* as to deaths from heart attacks, strokes, and vascular ruptures.

However, the "except as provided in this subdivision" exception has meaning in the statute without designating those types of deaths as natural-cause deaths. Two things can be true: (1) a heart-related death that is a natural-cause death can only qualify for benefits under the statute if they meet the presumption criteria "as provided in this subdivision"; and (2) a heart-related death that is a line-of-duty death and *not* natural-cause death under *Kramer* and *Johnson* can *also* qualify for benefits. The logic applies as follows: a public officer dies from a heart attack. If the officer's death meets the presumption criteria and the Commissioner either chooses not to rebut the presumption or attempts to do so unsuccessfully, that death may be a natural-cause death that meets the "except as provided in this subdivision" exception. If the officer's death either does not meet the presumption criteria or the Commissioner successfully rebuts the presumption with competent medical evidence, the ALJ then applies *Kramer* and *Johnson* to determine whether the death was a line-of-duty death. If the ALJ concludes that the death was a line-of-duty death under *Kramer* and *Johnson*, it was not a natural-cause death excluded by the statute and it qualifies for benefits. If the ALJ concludes that the death was *not* a line-of-duty death under *Kramer* and *Johnson*, the death does not qualify for benefits—either because it is a natural-cause death excluded by the statute or because it does not meet some other part of the "killed in the line of duty" definition.

Because the amended statute may be read consistent with *Kramer* and *Johnson* and there is nothing in the statute or legislative history indicating that the 2016

34

amendments were enacted to replace *Kramer* or *Johnson*, we reject the Commissioner's contention that the Legislature designated deaths from heart attacks, strokes, and vascular ruptures categorically as natural-cause deaths and superseded *Kramer* and *Johnson* as to those types of deaths. *See Zephier v. Agate*, 957 N.W.2d 866, 871 (Minn. 2021) ("We presume that statutes are consistent with the common law and, we do not presume that the Legislature intends to abrogate or modify a common law rule except to the extent expressly declared or clearly indicated in the statute." (citation omitted) (internal quotation marks omitted)).

We hold that Minn. Stat. § 299A.41, subd. 3, creates a rebuttable presumption for certain heart-related deaths that did not replace the *Kramer* and *Johnson* definition of "killed in the line of duty" for those deaths. Under Minn. Stat. § 299A.41, subd. 3, a public safety officer who dies from a heart attack, stroke, or vascular rupture was "killed in the line of duty" if the death meets the statutory presumption criteria and, if the death does not satisfy the presumption criteria or the Commissioner rebuts the presumption with competent medical evidence, the officer's estate can present its own medical evidence to show that the officer was "killed in the line of duty" under *Kramer* and *Johnson*. We therefore reverse the court of appeals holding that *Kramer* and *Johnson* do not apply to deaths from heart attack, stroke, or vascular rupture.

\*　　\*　　\*

Because the evidence viewed in the light most favorable to Ms. Groebner shows that Groebner may have engaged in a situation involving nonroutine stressful or strenuous physical law enforcement or other emergency response activity during his last

35

shift, we hold that there is a genuine issue of material fact, and the ALJ erred by granting summary disposition. If, after an evidentiary hearing, the ALJ determines that Groebner's death did not satisfy the heart-related deaths presumption criteria or that the Commissioner successfully rebutted the presumption with competent medical evidence, Ms. Groebner can present her own medical evidence to show that Groebner was "killed in the line of duty" under *Kramer* and *Johnson*.[20]

## CONCLUSION

For the foregoing reasons, we affirm in part and reverse in part the decision of the court of appeals and remand to the Court of Administrative Hearings for proceedings consistent with this opinion.

Affirmed in part, reversed in part.

---

[20] We acknowledge that the ALJ purported to apply *Kramer* and *Johnson* in its order granting summary disposition. But the ALJ analyzed those cases in terms of whether Groebner's last shift "constitute[d] 'nonroutine stressful or strenuous' law enforcement under *Kramer* and *Johnson*." That was erroneous for two reasons. First, the "nonroutine stressful or strenuous" language in Minn. Stat. § 299A.41, subd. 3, is specific to the statutory presumption, while *Kramer* and *Johnson* control when the presumption does *not* apply or has been rebutted. Those cases thus go to whether the officer was "killed in the line of duty," but not specifically as to whether—for purposes of the presumption—the activity was "nonroutine stressful or strenuous." Second, as we have explained, the ALJ misapplied the "nonroutine stressful or strenuous physical" standard such that, contrary to its holding, there is a genuine issue of material fact as to whether Groebner engaged in a situation involving nonroutine stressful or strenuous physical law enforcement or other emergency response activity. For these reasons, remand to the ALJ is appropriate here.